## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| HEATHER SMITH individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>WHALECO INC. DBA TEMU,<br><br>    Defendant. | Case No. 5:23-cv-00559-D<br><br><br>CLASS ACTION<br><br><br>(JURY TRIAL DEMANDED) |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

Respectfully Submitted,

*/s/ Kathy R. Neal*
Mary Quinn-Cooper, OBA # 11966
Kathy R. Neal, OBA #674
McAFEE & TAFT, P.C.
Williams Center Tower II
Two W. Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone: 918-587-0000
Facsimile: 918-599-9317
Marvquinn.cooper@mcafeetaft.com
Kathv.neal@mcafeetaft.com

E. Powell Miller
*Admitted Pro Hac Vice*
The Miller Law Firm, P.C.
950 W. University Drive
Suite 300
Rochester, MI 48307
248-841-2200
Email: epm@millerlawpc.com

*Counsel for Plaintiff and the Putative Class*

## Table of Contents

I.  INTRODUCTION.................................................................................................. *- 5 -*

II.  THE REGISTRATION POP-UP ........................................................................ *- 6 -*

III.  ARGUMENT ....................................................................................................... *- 8 -*

   (a)  **Defendant Fails to Establish That any Agreement, Much Less an Agreement to Arbitrate, Was Ever Formed Between the Parties** ............................................ **- 8 -**

IV.  CONCLUSION.................................................................................................. *- 24 -*

# TABLE OF AUTHORITIES

**Cases**

*Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) ..................... - 18 -

*Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015) .............................- 11 -, - 17 -

*Boler v. Sec. Health Care, L.L.C.*, 336 P.3d 468, 477 (Okla. 2014) ........................... - 23 -

*Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832 (6th Cir. 2021) .............. - 8 -

*Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018) ........................... - 12 -

*Dollar Rent A Car Sys., Inc. v. P.R.P. Enter's., Inc.*, No. 01 CV 698 JHP FHM, 2006 WL 1266515, at \*22 (N.D. Okla. May 8, 2006) ................................................................ - 8 -

*Dunbar Eng'g Corp. v. Rhinosystems, Inc.,* 232 P.3d 931, 935 n. 8 ............................. - 9 -

*First Nat'l Bank & Trust Co. of El Reno v. Stinchcomb,* 734 P.2d 852, 854 (Okla.1987)- 9

*Forby v. One Techs., LP*, 2016 WL 1321194 (S.D. Ill. Apr. 5, 2016) ........................ - 11 -

*Guadagno v. E\*Trade Bank,* 592 F.Supp.2d 1263 (C.D. Cal. 2008) ........................... - 20 -

*Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012)..............- 8 -, - 20 -

*Hart-Parr Co. v. Brockreide*, 1920 OK 100, 77 Okla. 277, 188 P. 113, 114 ................ - 8 -

*Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 981 (10th Cir. 2014) ................. - 22 -

*Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304–05 (10th Cir. 2017) ....................... - 23 -

*Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 Fed. Appx. 782 (11th Cir. 2008) ..................................................................................................................... - 8 -

*Major v. McCallister,* 302 S.W.3d 227, 230 (Mo. Ct. App. 2009) .............................. - 19 -

*Meyer v. Uber Technologies, Inc.*, 868 F.3d 66 (2d Cir. 2017) ..... - 9 -, - 10 -, - 11 -, - 19 -

*Nat'l Env't Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1003 (10th Cir. 2001) .......... - 8 -

*Nguyen v. Barnes & Noble,* 763 F.3d 1171 (9th Cir. 2014) .......................................... - 10 -

*Ragab v. Howard*, 841 F.3d 1134 (10th Cir. 2016) ....................................................... - 7 -

*Redbox Automated Retail, Inc.*, No. 19-cv-01993 at 15 (ECF No. 32) (N.D. Ill. Mar. 25,
        2021) ...................................................................................................- 14 -, - 17 -

*Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D.
        Utah June 28, 2022) ................................................................ - 11 -, - 19 -, - 21 -, - 22 -

*Selden v. Airbnb, Inc.,* 4 F.4th 148, 156 (D.C. Cir. 2021) ........................................... - 11 -

*Sgouros v. TransUnion Corp*, 817 F.3d 1029 (7th Cir. 2016) ...................................... - 9 -

*Sgouros v. TransUnion Corp.*, 2015 WL 507584 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d
        1029 (7th Cir. 2016) .................................................................................. - 10 -

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136 (9th Cir. 1991)  - 8 -

*TopstepTrader, LLC v. OneUp Trader, LLC*, 2018 WL 1859040 (N.D. Ill. Apr. 18, 2018)
        ........................................................................................................................ - 10 -

*Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012) ... - 8 -

*Voss v. City of Okla. City*, 618 P.2d 925, 928 (Okla. 1980) ........................................ - 23 -

**Statutes**

Federal Arbitration Act, 9 U.S.C. §§ 1-16 .............................................................- 4 -, - 21 -

Oklahoma's Telephone Solicitation Act, Okla. Stat. tit. 15, § 775C.1, *et seq* ............... - 4 -

**Treatises**

17B C.J.S. Contracts § 931 ............................................................................................. - 8 -

Restatement (Second) of Contracts § 19(2) (1981) ......................................................... - 9 -

Plaintiff Heather Smith hereby files her opposition to Defendant Whaleco, Inc. d/b/a TEMU's ("TEMU") Motion to Compel Arbitration (hereinafter "the Motion") (ECF No. 11) and states as follows:

## I.  <u>INTRODUCTION</u>

In this consumer class action, Plaintiff, individually and on behalf of a proposed class, alleges a single claim against Defendant for transmitting unsolicited marketing text messages to her cellular telephone in violation of Oklahoma's Telephone Solicitation Act, Okla. Stat. tit. 15, § 775C.1, *et seq.* ("OTSA").  Defendant now moves to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA").

The Motion fails because Defendant has failed to establish that the parties formed an agreement (much less an agreement to arbitrate). Defendant contends that by creating a user account on Defendant's website, Temu.com, on December 30, 2022, Plaintiff agreed to the website's "Terms of Use" and its incorporated arbitration provision. However, the registration pop-up form that Defendant says Plaintiff completed fails to clearly and conspicuously notify users that by clicking the "Continue" button at the top middle of the page to advance with the registration flow, site users are agreeing to be bound by the Terms of Use (including its incorporated arbitration provision).  This is because the only mention of the Terms of Use on the pop-up registration form appeared in small, lightly colored font well beneath the massive, bright orange "Continue" button, buried underneath several other brightly colored buttons having nothing to do with Plaintiff's registration on the site.  In other words, rather than placing the Terms of Use hyperlink in visual proximity to the button, Defendant purposefully presented the hyperlink at the bottom of the page, in small

inconspicuous light grey color set against a white background, so that visitors like Plaintiff would not see the link and not be dissuaded from registering on the site.

Based on the website's presentation of the Terms of Use, no consumer who completed this form received clear and conspicuous notice that by continuing with the registration flow she or he was assenting to the Terms of Use. Because the registration pop-up failed to adequately notify anyone who visited it of the Terms of Use that appeared below the "Continue" button, Defendant cannot establish that Plaintiff (or any other consumer) objectively manifested their assent to be bound by the Terms of Use by clicking that button. Accordingly, the motion should be denied.[1]

## II.   THE REGISTRATION POP-UP

As Defendant describes its records, Plaintiff registered for the Temu.com website on December 30, 2022. *See* Declaration of Michael Trinh (ECF No. 11-1 (the "Trinh Decl.") ¶ 10). On December 30, 2022, per the Trinh declaration the Temu.com website featured the following registration interface which appeared as a pop-up (*id.* at ¶ 6):

---

[1] Inexplicably the Motion also includes as Exhibit 2 a purported consent form which Defendant assert shows that Plaintiff agreed to receive autodialed marketing messages on her cell phone. (Mot. at 5). Exhibit 2 is a screenshot of a generic "consent form". Defendant has not produced any evidence in support of the Motion that Plaintiff completed the form and Plaintiff specifically denies that she had. But at any rate, neither Exhibit 2 nor the disputed assertion that Plaintiff has consented to receive text messages is material to the question presented by the Motion - whether the case should be directed to arbitration; and as such, should be disregarded by the Court.



To begin registering with the site, visitors have the option to either: (1) input an email address or phone number at the top of the pop-up screen and then press the large, bright orange "Continue" button located in the middle of the screen; or (2) click one of the four buttons on the bottom half of the pop-up screen (beneath the orange "Continue" button and beneath the divider line with the text "or continue with other ways"), which then allows the visitor to register with the site via a Google, Facebook, Twitter, or Apple account. The sentence containing the hyperlink to the Terms of Use appears at the very bottom of the second section of the pop-up screen, beneath the four "other ways" to register. The Terms of Use link appears in smaller and more lightly colored font than the "Free shipping" "Free

returns" and "Continue" text that appears in bold, black font – and, contrary to what Defendant says in the Motion (Mot. at 8), the Terms of Use text did not appear in bold font type.

## III.  ARGUMENT

**(a)    Defendant Fails to Establish That any Agreement, Much Less an Agreement to Arbitrate, Was Ever Formed Between the Parties**

Defendant moves to compel Plaintiff to arbitration, arguing that Plaintiff agreed to the Terms of Use, and its incorporated arbitration provision, when she registered on its website. This argument fails because Defendant cannot establish, given the configuration and appearance of its registration pop-up, that Plaintiff (or any other visitor) objectively manifested their assent to the Terms of Use by clicking the "Continue" button on the pop-up screen.  Mutual assent is a necessary element to establishing that an agreement to arbitrate was formed between the parties, and without it there is no basis for Defendant to compel arbitration in this case.

"[W]hether a party agreed to arbitration is a contract issue, meaning arbitration clauses are only valid if the parties intended to arbitrate." *Ragab v. Howard*, 841 F.3d 1134, 1137 (10th Cir. 2016). Thus, arbitration can be compelled "[o]nly when there is no genuine issue of fact concerning the formation of the agreement." *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012), *aff'd*, 925 F. Supp. 2d 1185 (D. Colo. 2013) (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991)). "If there is doubt as to whether such an agreement exists," Defendant has failed to carry its burden and the Motion must be denied. *See id*. at 1141.

Courts apply state law principles to determine whether a contract has been formed. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012). Under Oklahoma law, a contract's proponent has the burden to establish its existence. 17B C.J.S. Contracts § 931 ("the burden of proof is on the party seeking to enforce an agreement or to claim rights under it."); *see also Dollar Rent A Car Sys., Inc. v. P.R.P. Enter's., Inc.*, No. 01 CV 698 JHP FHM, 2006 WL 1266515, at *22 (N.D. Okla. May 8, 2006), *aff'd*, 242 F. App'x 584 (10th Cir. 2007) (party asserting rights under contract has burden to establish existence of the contract). "[A] district court considering the making of an agreement to arbitrate should give to the party denying the agreement the benefit of all reasonable doubts and inferences[.]" *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 Fed. Appx. 782, 786 (11th Cir. 2008).

"One of the essential elements of a contract is that there must be mutuality of agreement; both of the contracting parties must assent to its terms. *Hart-Parr Co. v. Brockreide*, 1920 OK 100, 77 Okla. 277, 188 P. 113, 114. Mutuality of assent is judged by <u>an objective standard</u>, looking to the express words of the parties and their visible acts, <u>not their subjective states of mind</u>." *Nat'l Env't Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1003 (10th Cir. 2001); Restatement (Second) of Contracts § 19(2) (1981) (party's conduct not a manifestation of assent unless "he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents").

Because a contract cannot be formed without the parties' mutual assent to the essential terms of the agreement, *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d at 1255

(citing *Dunbar Eng'g Corp. v. Rhinosystems, Inc.*, 232 P.3d 931, 935 n. 8 (Okla. Civ. App. Div. 2010)), "basic contract law principles in … Oklahoma indicate that if an [electronic] agreement gives a consumer <u>reasonable notice of its terms and the consumer affirmatively manifests assent to the terms</u>, the consumer is bound by the terms. *Id.* (citing *First Nat'l Bank & Trust Co. of El Reno v. Stinchcomb,* 734 P.2d 852, 854 (Okla.1987)) (emphasis added).  Courts nationwide are in accord.  *See Meyer v. Uber Tech.'s, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (explaining that, in cases involving smartphone or online-based contracts, "[c]ourts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract…as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement").

However, "a person using the Internet may not realize that she is agreeing to a contract at all, whereas a reasonable person signing a physical contract will rarely be unaware of that fact." *Sgouros v. TransUnion Corp*, 817 F.3d 1029, 1034-35 (7th Cir. 2016).  In addressing whether a consumer has agreed to be bound by an online-based contract of adhesion, such as the one Defendant says Plaintiff agreed to in this case, courts typically classify consumer-facing websites that purport to bind consumers to certain terms of use as either a "clickwrap" or "browsewrap." A "clickwrap" is where a user clicks a button or checks a box that explicitly affirms acceptance of the terms after having the opportunity to view or scroll through the terms, and this type of agreement is generally enforced. *Sgouros,* 2015 WL 507584, at *4 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d 1029 (7th Cir. 2016); *Nguyen v. Barnes & Noble,*763 F.3d 1171, 1175-76 (9th Cir. 2014). A "browsewrap," on the other hand, is a page that purports to bind visitors to terms based

merely on the visitors navigating or using the website, without requiring them to sign electronic documents or explicitly click an "accept" or "I agree" button. *Sgouros*, 2015 WL 507584, at *6. "Courts enforce browsewrap agreements only when there is actual or constructive knowledge of terms." *Id.*

"Of course, human ingenuity and the constant development of technology means that not all interfaces fit neatly into one of these two categories." *TopstepTrader, LLC v. OneUp Trader, LLC*, 2018 WL 1859040, at *3 (N.D. Ill. Apr. 18, 2018) (citing *Meyer*, 868 F.3d at 75-76). A page that falls in-between the "clickwrap" and the "browsewrap" has been termed a "hybrid" or "sign-in-wrap." *Id.* This type of "hybrid" page "never ha[s] the user take an affirmative action to explicitly agree to the terms of the site, but it does require some form of affirmative action by requiring the user to sign up for an account," or to take some other action such as placing an order for goods or services. *TopstepTrader*, 2018 WL 1859040, at *3. "Usually during [this] process, the webpage states something to the effect of: 'By signing up for an account [or placing an order] with [website provider], you are accepting the [website]'s terms of service.'" *Id.* "While a hyperlink to the Terms is provided, the user is not required to scroll through the terms, read the terms, or otherwise explicitly indicate that he agrees to those terms before pressing the 'Sign Up' [or 'Place Order'] button." *Id.* "In this scenario, the user 'agrees' to the terms by signing up or creating an account," or by placing an order. *Id.*

The Temu.com registration pop-up is at best of the hybrid, "sign-in-wrap" variety. *See Selden v. Airbnb, Inc.,* 4 F.4th 148, 156 (D.C. Cir. 2021) ("a sign-in wrap bundles signing up for a service with agreement to the website's contractual terms."). "To

determine whether sign-in-wrap and browsewrap agreements are enforceable, courts engage in fact-intensive inquiries of the layout and language of a website or application." *Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022).

Generally speaking, courts will only find a consumer to have assented to the terms of a "hybrid" web-based form where the website clearly and conspicuously notified the user, next to the operative button, that by clicking the operative button he or she is agreeing to the terms (which must be accessible via a hyperlink), and where the visitor thereafter clicked the operative button. *See Meyer*, 868 F.3d at 79 ("As long as the hyperlinked text was itself reasonably conspicuous...a reasonably prudent smartphone user would have constructive notice of the terms. While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice."); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 401 (E.D.N.Y. 2015) (noting that courts uphold hybrid agreements "where a hyperlink to the terms and conditions appears next to the only button that will allow the user to continue use of the website"); *e.g.*, *Forby v. One Techs., LP*, 2016 WL 1321194, at *1 (S.D. Ill. Apr. 5, 2016) (enforcing terms where the user clicked the "Continue" button and the following statement, with a hyperlink to the terms, appeared directly *above* the button: "By clicking on the 'Continue' button below, you agree to the Offer Details, to the Terms and Conditions").

In this case, Defendant contends that Plaintiff assented to the Terms of Service by virtue of her clicking the "Continue" button on the Temu.com registration flow. However, the layout and language of Defendant's registration pop-up – featuring a large bright orange

Continue button far above the "Terms of Use" hyperlink at the very bottom, submerged beneath four other buttons in another section of the pop-up screen – failed to clearly and conspicuously notify Plaintiff (or any other consumer who clicked the Continue button) that the user was agreeing to be bound by the Terms of Service by clicking that button. Accordingly, Defendant cannot establish that Plaintiff mutually assented to Terms of Use or its incorporated arbitration provision.

Indeed, courts routinely have rejected the notion that presentations like the one Defendant employed on its Temu.com website are capable of manifesting a reasonable consumer's assent to terms of use. For example, in *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018), the First Circuit reversed the district court's granting of a motion to compel arbitration based on a careful analysis of the sign-in-wrap screens' presentation and layout. Among the features the First Circuit noted that rendered the screens incapable of manifesting assent were the fact that "Uber's "Terms of Service & Privacy Policy" hyperlink did not have the common appearance of a hyperlink. The Court stated:

> While not all hyperlinks need to have the same characteristics, they are "commonly blue and underlined*." CR Assocs. L.P. v. Sparefoot, Inc.*, No. 17-10551-LTS, 2018 WL 988056, at *4 n.4 (D. Mass. Feb. 20, 2018); see also e.g., *Meyer*, 868 F.3d at 78 ("[T]he hyperlinks are in blue and underlined."); *Adelson v. Harris*, 774 F.3d 803, 808 (2d Cir. 2014) ("[T]he hyperlinks were not hidden but visible in the customary manner, that is, by being embedded in blue, underlined text*."*) ...Here, the "Terms of Service & Privacy Policy" hyperlink was presented in a gray rectangular box in white bold text. Though not dispositive, the characteristics of the hyperlink raise concerns as to whether a reasonable user would have been aware that the gray rectangular box was actually a hyperlink.

*Cullinane*, 893 F.3d at 64

Here, the linked Terms and Conditions were presented in inconspicuous light grey text on a white background, and not in blue or some other more conspicuous color:



Typically, courts view the website owner's choice to use of grey or light grey for notice purposes (especially when the text fails to contrast with the background), skeptically.  *See e.g. Cullen v. Shutterfly Lifetouch, LLC*, No. 20-CV-06040-BLF, 2021 WL 2000247, at *8 (N.D. Cal. May 19, 2021) (finding defendant failed to carry its burden to prove assent to arbitration stating: "The subject language is in tiny print, that appears to be light gray in color, and there is no header or other indicator that would notify an individual of important contractual terms."); *Redbox Automated Retail, Inc.*, No. 19-cv-01993 at 15 (ECF No. 32) (N.D. Ill. Mar. 25, 2021) ("[T]he Court finds the gray disclosure text surrounding the hyperlinks not reasonably conspicuous because there is insufficient contrast between the gray text and the black background."); *see also Fisher v. Sutton*

*Place/Pinnacle A.M.S.*, No. 1:07-CV-1537-DFH-WTL, 2008 WL 2095417, at *2 (S.D. Ind. May 16, 2008) ("The fact that the agreement imposes an obligation to arbitrate disputes is clear and prominent. This was not an arbitration agreement buried in small, light-gray type on the back of an invoice or purchase order. No literate person completing and signing the form could have missed the agreement to arbitrate, which is the subject of five of eight pages in the document."). For example, an identical contention by the defendant in *Sellers v. JustAnswer LLC,* 73 Cal. App. 5th 444, 479, 289 Cal. Rptr. 3d 1, 28 (2021), *reh'g denied* (Jan. 18, 2022), *review denied* (Apr. 13, 2022) was rejected by the court which found that the following sign-up-wrap presentation did not manifest the plaintiff's assent to be bound to the Terms of Service:



The *Sellers* court determined the linked text failed to provide adequate notice because of the presence of features <u>identical</u> to the Temu.com pop-up, namely that "the textual notice on the mobile version is at the very bottom of the screen, in smaller text than anything else on the page, and in a grey hue that contrasts less with the dark background than any other text on the page." *Id.* at 479.  Defendant's pop-up and should equally be found <u>not</u> to manifest assent.  While Defendant claims that its "Terms of Use" link is bolded, that is simply not true; the screen capture presented in the Motion itself shows that none of the text in the sentence containing the Terms of Use hyperlink is bolded.

Further confirming that no reasonable consumer received clear or conspicuous notice of the Terms of Use hyperlink on the Temu.com pop-up screen is the presence of several other brightly colored buttons between the bright orange "Continue" button and the inconspicuous link residing at the bottom of the screen.  The presence of these distracting buttons and fields, having nothing to do with Plaintiff's act of pressing the Continue button after inputting her email or phone number, between the Continue button and the Terms of Use sentence beneath those four buttons confirms no consumer was on objectively reasonable notice that he or she would be assenting to be bound by the Terms of Use by clicking the orange Continue button.

In fact, given the distance between the bright orange Continue button and small grey sentence which states "By continuing you agree to our Terms of Service" and the intervening presence of four buttons immediately above that sentence, it is reasonable that the *if* an ordinary consumer saw the sentence  at all – inconspicuous as it is – she or he would believe that the agreement to the "Terms of Service" only applied to registrations

made by pressing one of the four immediately adjacent buttons, and not to the registrations via the orange "Continue" button, which appears mid-screen.

In *Cullinane*, the First Circuit noted that the presence of several buttons on the screen (as here) likely rendered a web-based form incapable of manifesting users' assent to the terms and conditions that were accessible via a hyperlink.  As the court put it: "the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention. If everything on the screen is written with conspicuous features, then nothing is conspicuous."

Likewise, in *Nicosia v. Amazon.com, Inc.*, where the defendant's order page - similar to the Temu.com registration page – stated that "by placing your order, you agree to Amazon.com's privacy notice and conditions of use," *Nicosia*, 834 F.3d 220, 237 (2d Cir. 2016) the Second Circuit found that, given the manner in which the statement appeared on the order page, the defendant had "failed to show that [the plaintiff] was on notice and agreed to mandatory arbitration as a matter of law" when she clicked a "Place your order" button. The court explained its reasoning in pertinent part as follows:

> . . .
> The message itself—"By placing your order, you agree to Amazon.com's…conditions of use"—is not bold, capitalized, or conspicuous in light of the whole webpage.…There are numerous other links on the webpage, in several different colors, fonts, and locations, which generally obscure the message. …

*Nicosia*, 834 F.3d at 236-37 (citations omitted).

This was also the case in *Wilson v. Redbox Automated Retail, Inc.*, No. 19-cv-01993 at 11 (ECF No. 32) (N.D. Ill. Mar. 25, 2021) where the court found that linked Terms of Service were not effectively presented because "the button for the Terms of Use and accompanying disclosure [were] not adjacent to the "Pay Now" button. Rather, the "Pay Now" button appears in the middle of the right side of the screen while the Terms of Use and disclosure appear at the bottom.   The court found that the website's checkout page failed to manifest assent to the linked terms of service because of  "general clutter" caused by intervening buttons between the "Pay Now" button and linked terms and conditions which stated "by pressing 'Pay Now' you agree to the Terms which "dilute[d]" the effectiveness of the notification."  *Id.* at 13.

This is more or less an apt description of the Temu.com's pop-up, where the Continue button is several rows about the linked Terms of Service, not immediately adjacent to it, and separated by a various options including a "Trouble signing in button" and four colorful buttons which provided alternative ways to sign up for a Temu.com account.

In *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015) the court found that even though the defendant put text *directly* above the sign in button, which stated that by signing in the user agreed to the terms of use, the disclosure was nonetheless "insufficient to give adequate notice." *Id.* at 404. The court explained that the "hyperlink to the 'terms of use' was not in large font, all caps, or in bold," especially in contrast to the "user-friendly and obvious" "'SIGN IN' button" that appeared "in all caps." *Id.* Accordingly, the court concluded that this "sign-in contract of adhesion" was "not binding on [plaintiff]." *Id.* Here,

as in *Berkson*, pressing the pop-up's "Continue" button does not cause the "'terms of use' [to] appear in a new screen or in a [separate] pop-up window on the same screen," and "[t]he importance of the 'terms of use' [is] obscured by the physical manifestation of assent" to continue the registration flow either by pressing the Continue button or selecting one of four alternative ways to continue with the registration. *Id.* Accordingly, the only thing Defendant's pop-up screen is capable of manifesting is an intention to start a Temu account, and certainly not anyone's assent to the Terms of Use. *See also, Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (though defendant required plaintiff to click a "box" next to hyperlink with the defendant's terms of service, court concluded that plaintiff was not put "on inquiry notice of the terms of service," because the page featuring the clickable box featured a much larger "'Next' bar at the bottom of the screen," which "dwarfed" the "I agree to Lyft's Terms of Service" language that is featured in "smallest font on the screen," such that "[a] reasonable consumer would not have understood that the light blue 'Terms of Service' hyperlinked to a contract for review")

In this case, the Terms of Use link appeared in small grey font well below the giant, bright orange "Continue" button, with four other buttons (also brightly colored, featuring the logos of Google, Facebook, Twitter, and Apple) appearing in between the Continue button at the top and the Terms of Use link at the bottom. As in *Cullinane* the presence of these buttons diminishes the objective likelihood that a consumer would be apt to notice the linked Terms and Conditions. *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018).

In other words, "the layout and language" of the page fails to "give the user reasonable notice that a click [on the Continue button] will manifest assent to [the Terms of Use or its incorporated arbitration provision]." *Meyer*, 868 F.3d at 75. Simply put: Defendant's pop-up registration screen failed to adequately notify, in an objectively clear and conspicuous manner, Plaintiff or any other consumer that, by clicking the giant orange Continue button, they were agreeing to be bound by the Terms of Use mentioned at the bottom of the screen. Accordingly, Defendant has failed to satisfy its burden to show that Plaintiff or any other visitor of this page who pressed the Continue button manifested their assent to the Terms of Use (or its incorporated arbitration provision).

The authorities the Motion cites are all readily distinguishable. As stated above, a court's review of a sign-up-wrap is fact intensive. *See Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022). Defendant first cites *Major v. McCallister,* 302 S.W.3d 227, 230 (Mo. Ct. App. 2009) (Mot. at 11-12) to support its contention that the pop-up's text and layout support a finding of mutual assent to arbitration, but *Major* reveals just how deficient Defendant's pop-up is in terms of manifesting assent. In *Major* the court explained that the defendant's hyperlinked terms were a "immediately visible" "blue hyperlink" "right next to the button Appellant pushed." *Id.* at 230. Moreover, there was more than one link to the terms on the page which was visible without scrolling and there were "similar links on every other website page." *Id.* Here, Defendant's pop-up featured a single, inconspicuous grey hyperlink located on the very bottom of the pop-up window, separated from the bright orange "Continue" button by four other colorful icons. If anything, it appears as though Defendant designed its website

*not* to draw attention to the linked Terms of Use, and the page plainly failed to adequately notify visitors of the existence of those Terms.  And as explained above, even if a visitor happened to see the sentence at the bottom, the visitor would not have reasonably understood the sentence containing the Terms of Use hyperlink to pertain to visitors who clicked the orange Continue button (but rather only to visitors who registered using one of the four methods provided in the buttons appearing immediately above the sentence containing the Terms of Use hyperlink).

Similarly misplaced is the Motion's reliance on *Guadagno v. E\*Trade Bank,* 592 F.Supp.2d 1263 (C.D. Cal. 2008) (Mot. on 12).  Again, the difference is obvious on its face.  For one, *Guandago* involved a clickwrap agreement, not a sign-up-wrap as here. Clickwrap agreements enjoy a presumption of validity under the law.  *Hancock*, 701 F.3d at 1256 ("Clickwrap agreements are increasingly common and have routinely been upheld.") (internal citation and quotation omitted).  But setting aside that *Guandago* involved a clickwrap, the more salient issue is that the presentation of the link to the Terms and Conditions was conspicuous and obviously structured to put a reasonable person on notice that they were assenting to arbitration, as noted by the Court: "In the instant case, a highlighted, underlined link to the Agreement was directly above the acknowledgment box, along with notice that "The following contain important information about your account(s)."  A reasonably prudent offeree would have noticed the link and reviewed the terms before clicking on the acknowledgment icon." *Id*. at 1271.  By contrast, here the hyperlink was not immediately adjacent to the "Continue button" and was not highlighted.

To the contrary, it was deliberately presented in small font, not set against a contrasting background, and not highlighted in any way.

Finally, the Motion cites to the district court's decision in *Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022) which the Motion stresses dealt with a sign-up-wrap presentation similar to here because the Terms and Conditions were presented by a link and the overall presentation was a single screen pop-up. (Mot. at 13). The actual pop-up in *Route App* serves as an example of one which *could* provide conspicuous notice of the terms. The following is a capture of the pop-up[2]:



---

[2] *Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB (ECF No. 25-1, ¶ 15).

While the image resolution is low, it is obvious that linked terms and conditions (which are on the right side of the image with the white background) are hyperlinked in blue which stands out against a white backdrop, presented without any other distracting colorful logos or buttons, clearly applies to any consumer registration done on that page, and is in close proximity immediately above the grey submit button.[3]

The Temu.com pop-up stands in stark contrast and it is obvious for the reasons discussed above that the *Route App* pop-up is not an apt comparison.  While the court in *Route App* could find based on the pop-up's design and overall presentation that the Terms and Conditions link was sufficiently conspicuous as to give the user reasonable notice, the same cannot be said of the pop-up at issue here.

Defendant's bid to compel arbitration on these facts is offensive to any consumer's reasonable expectations of fair play, and this Court need not go along. Because Defendant has failed to satisfy its burden to show "an objective manifestation of assent", *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 981 (10th Cir. 2014), to the Terms of Use (and its

---

[3] While the *Route App, Inc.* decision does not reproduce the image, it describes it as follows:

> Here, the type of agreement that Heuberger encountered is a sign-in-wrap agreement. According to Heuberger's declaration, to access Route App's products, users must create an account where they are prompted to enter an email address, name, phone number, and confirm a password. In small print below it states: "Already have an account?" and then provides a link to "LOG IN here." Directly below that is text stating "By continuing, you are agreeing to our Terms of Service and Privacy Policy." The words "Terms of Service" are underlined in blue font and hyperlink to a separate webpage listing Route's Terms and Conditions.

*Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022)

incorporated arbitration agreement) by clicking the Continue button, the Court should find that this proceeding is not "referable to arbitration" and deny the Motion. *See* 9 U.S.C. § 3; *see also, e.g.*, *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304–05 (10th Cir. 2017) ("In present-day Oklahoma, a contract is defined by statute as "an agreement to do or not to do a certain thing.") (citing Okla. Stat. Ann. tit. 15, § 1); *see also Voss v. City of Okla. City*, 618 P.2d 925, 928 (Okla. 1980) ("An agreement for the submission of an issue to arbitrators is a prerequisite to the commencement of a valid arbitration agreement." ); *Boler v. Sec. Health Care, L.L.C.*, 336 P.3d 468, 477 (Okla. 2014) ("Consent to arbitrate is an essential component of an enforceable arbitration agreement.").

## IV.    **CONCLUSION**

For the foregoing reasons, the Motion should be denied.


Respectfully Submitted,

*/s/ Kathy R. Neal*
Mary Quinn-Cooper, OBA # 11966
Kathy R. Neal, OBA #674
McAFEE & TAFT, P.C.
Williams Center Tower II
Two W. Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone: 918-587-0000
Facsimile: 918-599-9317
Marvquinn.cooper@mcafeetaft.com
Kathv.neal@mcafeetaft.com

E. Powell Miller
*Admitted Pro Hac Vice*
The Miller Law Firm, P.C.
950 W. University Drive
Suite 300
Rochester, MI 48307
248-841-2200
Email: epm@millerlawpc.com

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF ELECTRONIC SERVICE AND FILING

I hereby certify that on this 28th day of September, 2023, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to those registered participants of the ECF System.

*/s/ Kathy R. Neal*
Kathy R. Neal