**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| HEATHER SMITH, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | |
| v. | Case No. 5:23-CV-00559-D |
| WHALECO INC. d/b/a TEMU, | |
| *Defendant*. | |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   STATEMENT OF FACTS ...................................................................... 4

      A.    Plaintiff Voluntarily Agreed to Temu's Terms More Than Once ............... 4

      B.    The Terms Mandate Individual Arbitration of All Disputes ...................... 7

III.  ARGUMENT ........................................................................................... 9

      A.    A Valid and Binding Agreement to Arbitrate Exists in This Case. ........... 9

      B.    The FAA Applies to the Arbitration Provisions of the Terms. ................ 18

      C.    Any Arbitrability Disputes Have Been Delegated to the Arbitrator. ........ 19

      D.    The Arbitration Provisions are Properly Enforced Under the FAA .......... 21

            1.    Plaintiff's OTSA Claims Against Temu In This Case Fall
                  Squarely Within the Scope of the Arbitration Provisions. ............. 22

            2.    Plaintiff Has No Valid Arbitrability Challenges. ........................... 23

      E.    The Arbitration Must Proceed Solely on an Individual Basis ................. 24

      F.    Plaintiff's Lawsuit Should Be Dismissed in Its Entirety. ...................... 25

IV.   CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*AllCity Famly Healthcare Ctr. Inc. v. Boss Surgical Grp., LLC*,
  2014 WL 13000602 (E.D.N.Y. Apr. 23, 2014) ...................................... 11

*Allied-Bruce Terminix Cos. v. Dobson*,
  513 U.S. 265 (1995) ........................................................................... 19

*Am. Express Co. v. Italian Colors Rest.*,
  133 S.Ct. 2304--12 (2013) ................................................................. 24

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986) ...................................................................... 4, 22

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) ........................................................................... 24

*Avedon Eng'g, Inc. v. Seatex*,
  126 F.3d 1279 (10th Cir. 1997) ......................................................... 10

*Babcock v. Neutron Holdings, Inc.*,
  454 F. Supp. 3d 1222 (S.D. Fla. 2020) ......................................... 17, 18

*Bassett v. Elec. Arts Inc.*,
  2015 WL 1298644 (E.D.N.Y. Feb. 9, 2015) ....................................... 13

*Bassett v. Elec. Arts, Inc.*,
  93 F. Supp. 3d 95 (E.D.N.Y. 2015) ................................................... 10

*Bazak Int'l Corp. v. Tarrant Apparel Group*,
  378 F. Supp. 2d 377 (S.D.N.Y. 2005) ............................................... 10

*Beattie v. TTEC Healthcare Sols., Inc.*,
  2019 WL 2189481 (D. Colo. May 21, 2019) ................................. 13, 15

*Bellman v. i3Carbon, LLC*,
  563 F.App'x. 608 (10th Cir. 2014) ............................................... 10, 11

*Berman v. Freedom Fin. Network, LLC*,
  30 F.4th 849 (9th Cir. 2022) ............................................................. 14

*Bill Barrett Corp. v. YMC Royalty* Co., LP,
  918 F.3d 760 (10th Cir. 2019) ........................................................... 11

*Bitumenes Orinoco, S.A. v. New Brunswick Power Holding Corp.*,
  2007 WL 485617 (S.D.N.Y. Feb. 13, 2007) ...................................... 10

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) ........................................................... 21

# TABLE OF AUTHORITIES

(continued)

**Page**

*Buckeye Check Cashing v. Cardegna*,
   546 U.S. 440 (2006) ......................................................................... 11, 20, 25

*Carr v. Credit One Bank*,
   2015 WL 9077314 (S.D.N.Y. Dec. 16, 2015) ............................................ 24

*Citizens Bank v. Alafabco, Inc.*,
   539 U.S. 52 (2002) ...................................................................................... 19

*Clary v. The Stanley Works*,
   2003 WL 21728865 (D. Kan. July 24, 2003) ............................................. 10

*Clements v. Alto Tr. Co.*,
   2023 WL 5002472 (D.N.M. Aug. 4, 2023) ................................................. 16

*Conrad v. Phone Dirs. Co.*,
   585 F.3d 1376 (10th Cir. 2009) .................................................................... 4

*Davis v. USA Nutra Labs*,
   303 F. Supp. 3d 1183 (D.N.M. 2018) ............................................. 13, 15, 20

*Dean Witter Reynolds Inc. v. Byrd*,
   470 U.S. 213 (1985) .................................................................................... 22

*DIRECTV, Inc. v. Imburgia*,
   136 S.Ct. 463 (2015) ................................................................................... 24

*Errato v. Am. Exp. Co.*,
   2019 WL 3997010 (D. Conn. Aug. 23, 2019) ............................................ 10

*Fedor v. United Healthcare, Inc.*,
   976 F.3d 1100 (10th Cir. 2020) .................................................................. 20

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) .................................................................................... 10

*Fontanez v. Whaleco Inc.*,
   Case No. 53-2023CA-000374, slip op. (Fla. Cir. Ct. Aug. 29, 2023) ............. 3, 15, 18

*Graf v. Match.com, LLC*,
   2015 WL 4263957 (C.D. Cal. July 10, 2015) ....................................... 16, 24

*Green Tree Fin. Corp.-Ala. v. Randolph*,
   531 U.S. 79 (2000) ......................................................................... 4, 12, 22

*Hancock v. Am. Tel. & Tel. Co.*,
   701 F.3d 1248 (10th Cir. 2012) ............................................ 10, 11, 13, 14

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   139 S.Ct. 524 (2019) ................................................................................... 20

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Johnson v. Whaleco, Inc.*,
 Case No. 5:23-cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023) ..................................... 15

*Klein v. Experian Info. Sols., Inc*.,
 2020 WL 6365766 (S.D.N.Y. Oct. 29, 2020) .............................................................. 10

*KPMG LLP v. Cocchi*,
 565 U.S. 18 (2011)......................................................................................................... 9

*Levine v. Vitamin Cottage Nat. Food Markets, Inc.*,
 2021 WL 4439800 (D. Colo. Sept. 27, 2021) .............................................................. 11

*Lisa Cooley, LLC v. Native, S.A.*,
 2021 WL 860591 (S.D.N.Y. Mar. 5, 2021) .................................................................. 10

*Marmet Health Care Ctr., Inc. v. Brown*,
 565 U.S. 530 (2012) ................................................................................................. 12, 23

*Melnick v. TAMKO Bldg. Prod. LLC*,
 2022 WL 4355299 (D. Kan. Sept. 20, 2022) ............................................................... 12

*Meyer v. Uber Technologies, Inc.*,
 868 F.3d 66 (2d Cir. 2017).................................................................................... 17, 18

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
 460 U.S. 1 (1983) ..................................................................................................... 12, 23

*Naizgi v. HSS, Inc.*,
 2023 WL 4933183 (D. Colo. Aug. 2, 2023) ................................................................ 20

*Nardo v. HomeAdvisor, Inc.*,
 2022 WL 17547940 (D. Colo. July 27, 2022), *report and rec. adopted,* 2022 WL
 17547938 (Aug. 11, 2022) ........................................................................................... 13

*Nguyen v. Barnes & Noble, Inc.*,
 763 F.3d 1171 (9th Cir. 2014) ............................................................................... 12, 14

*Nichols v. Google LLC*,
 2023 WL 5938917 (D. Colo. Sept. 12, 2023) .............................................................. 13

*Nicosia v. Amazon.com, Inc.*,
 384 F. Supp. 3d 254 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020) .......... 12

*Oberstein v. Live Nation Ent., Inc.*,
 60 F.4th 505 (9th Cir. 2023) ........................................................................................ 14

*Ostreicher v. TransUnion, LLC*,
 2020 WL 3414633 (S.D.N.Y. June 22, 2020) ............................................................. 24

# TABLE OF AUTHORITIES
(continued)

**Page**

*Pacelli v. Augustus Intel., Inc.*,
    459 F. Supp. 3d 597 (S.D.N.Y. 2020) ........................................................... 21

*Petrie v. GoSmith, Inc.*,
    360 F. Supp. 3d 1159 (D. Colo. 2019) ........................................................ 13

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967) .............................................................................. 19, 22

*Rent-A-Center, West, Inc. v. Jackson*,
    561 U.S. 63 (2010) ................................................................................ 20, 25

*Route App, Inc. v. Heuberger*,
    2022 WL 2316377 (D. Utah June 28, 2022) ................................................ 13

*Selden v. Airbnb, Inc.*,
    2016 WL 6476934 (D.D.C. Nov. 1, 2016)
    *aff'd*, 4 F.4th 148 (D.C. Cir. 2021) ................................................ 13, 17, 18

*Smith v. Fed Ex*,
    2022 WL 2819142 (W.D. Okla. July 19, 2022) ...................................... 22, 23

*Starke v. Gilt Groupe, Inc.*,
    2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ........................................ 16, 17

*Stein v. Burt-Kuni One, LLC*,
    396 F. Supp. 2d 1211 (D. Colo. 2005) ........................................................ 12

*Stolt-Nielsen v. Animalfeeds Int'l Corp.*,
    559 U.S. 662 (2010) ...................................................................................... 25

*THI of New Mexico at Hobbs Ctr., LLC v. Spradlin*,
    893 F. Supp. 2d 1172 (D.N.M. 2012), *aff'd*, 532 F. App'x 813 (10th Cir. 2013) ........ 25

*Walker v. Neutron Holdings, Inc.*,
    2020 WL 703268 (W.D. Tex. Feb. 11, 2020) ...................................... 16, 17, 18

## STATUTES

9 U.S.C. § 1 ............................................................................................................. 3

9 U.S.C. § 2 ....................................................................................... 19, 20, 21, 22

9 U.S.C. § 4 ......................................................................................................... 25

Okla. Stat. tit. 15, § 775C. ..................................................................................... 3

## I.      <u>INTRODUCTION</u>

Whaleco Inc. d/b/a Temu ("Temu") runs a global online retail marketplace where consumers can purchase a variety of products. *See* Declaration of Michael Trinh ("Trinh Decl."), filed herewith, at ¶¶ 3-17. As is common in today's heavily online economy, Temu has a simple e-commerce platform that is utilized by companies in every business sector and well-known to consumers, even those who are not "tech savvy." To participate in the marketplace, one must either download Temu's smartphone application (the "App") or visit its website, www.temu.com (the "Website"), set up an account, and agree to Temu's "Terms of Use" (the "Terms"). *Id.* Importantly, one cannot participate without first completing *all* the account signup steps and agreeing to the Terms, which contain various provisions governing the relationship between Temu and the App or Website users, including in particular a binding individual arbitration provision and separate class action waiver clause (hereafter collectively, the "Arbitration Provisions"). *Id.* Moreover, after registering, a consumer *must* agree to the Terms if they later input their credentials and log on to their account via the App or Website. *Id.* Heather Smith ("Plaintiff") is one such consumer.

On December 30, 2022, Plaintiff downloaded the App on her smartphone and signed up for an account, voluntarily agreeing to the Terms containing the Arbitration Provisions in the process. *Id.* ¶¶ 6-17 and Exhibit ("Ex.") A thereto. This is indisputable. Indeed, from the very outset, the operative Terms to which Plaintiff assented state, in capitalized letters, *inter alia* that: (1) "SECTION 20 OF THE TERMS BELOW … CONTAINS, AMONG OTHER THINGS, AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED

EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND WHALECO BE RESOLVED BY BINDING AND FINAL ARBITRATION" and (2) "EACH OF US WAIVES OUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASSWIDE ARBITRATION." *Id*. ¶ 13 and Ex. B thereto, at p. 1. Similar language appears throughout Section 20, making it clear "***any dispute***" between Plaintiff and Temu of ***any kind***—including any dispute "relating in any way" to the Terms or "any communications" received from or on behalf of Temu—is ***subject to mandatory binding individual arbitration***. *Id*., Ex. B at § 20.1 (emphasis added). The Terms further provide "[t]he arbitration will be conducted by American Arbitration Association (the 'AAA') [] under its rules, including Consumer Arbitration Rules (the 'AAA Rules')." *Id*., Ex. B at § 20.5.

These Terms were presented to Plaintiff in a clear and conspicuous manner, in plain English, and more than once—when she first registered the App and later when she logged on using her smartphone thereafter. *Id*. ¶¶ 8-17. Plaintiff unambiguously manifested her assent to the Terms and the Arbitration Provisions within via a "clickwrap" agreement,[1] where she had to affirmatively click a "Continue" button in close proximity to the conspicuously-hyperlinked Terms and language stating: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." *Id*., Ex. A thereto (emphasis original). Such online agreements are commonplace and routinely enforced by courts across the country,

---

[1] As discussed below, courts in this Circuit have traditionally treated such online agreements like Temu's as "clickwrap" agreements or, to a lesser extent, as "hybrid wrap" or "sign-in wrap" agreements. *See* discussion at fn. 6 *infra*. No matter the label applied here, the Terms are valid and enforceable, and Plaintiff agreed to arbitrate her claims.

particularly in the arbitration context. The same is true for Temu's Terms, using the same process here. *See, e.g., Fontanez v. Whaleco Inc.*, Case No. 53-2023CA-000374, slip op. (Fla. Cir. Ct. Aug. 29, 2023) (attached hereto as Exhibit 1). This Court should join them.

In direct contravention of this valid and enforceable agreement to arbitrate, and despite having waived her class action rights, however, Plaintiff filed her putative class action Complaint in state court on May 22, 2023, which was timely removed to this Court on June 26, 2023. *See generally* Dkt. 1-1. In it, she asserts violations of the Oklahoma Telephone Solicitation Act (*i.e.*, Okla. Stat. tit. 15, § 775C *et seq*., the "OTSA"), the state analog to the federal Telephone Consumer Protection Act (the "TCPA"), based on "telephonic sales calls" (*i.e.*, text messages) she allegedly received from or on behalf of Temu on her cellphone without her consent. *See id*. Yet, not only do Plaintiff's OTSA claims stem directly from alleged "communications" from Temu (communications that she actually consented to receiving in any event), but she also unequivocally agreed to arbitrate all claims against Temu here ***strictly on an individual basis*** when she agreed to the Terms more than once. Through the instant Motion, therefore, Temu seeks to compel such an arbitration.

As demonstrated below, the Federal Arbitration Act (9 U.S.C. § 1, *et seq*., the "FAA") creates a strong presumption in favor of enforcing arbitration clauses, and requires courts to rigidly enforce arbitration agreements according to their terms—especially where, as here, the parties seek to achieve streamlined proceedings and expeditious results. Moreover, courts in the Tenth Circuit and elsewhere have consistently and routinely enforced online arbitration agreements, just like the one to which Plaintiff assented more than once in this case.

Accordingly, and because the broad scope of the Arbitration Provisions at issue plainly apply to Plaintiff's OTSA claims against Temu as alleged in the Complaint, the Court should grant this Motion and compel Plaintiff to submit her claims to individual arbitration, as she agreed. Further, while this case should be stayed in favor of that arbitration at the minimum under the FAA, Temu submits that dismissal of this entire case is warranted in this instance because all of Plaintiff's claims against Temu are subject to individual arbitration.[2]

## II.    STATEMENT OF FACTS

### A.    Plaintiff Voluntarily Agreed to Temu's Terms More Than Once.

Given the facts, Plaintiff cannot reasonably dispute that she assented to the Terms. Indeed, Temu's records reflect, on December 30, 2022, Plaintiff downloaded the App on her Android smartphone (the number for which ends in 9888) and completed all the steps to complete the registration process, thereby agreeing to be bound by the Terms and, as such, the corresponding Arbitration Provisions. *See* Trinh Decl., ¶¶ 6-17 & Exs. A - C thereto. At that time, Plaintiff was presented with a screen that would have appeared as follows:

---

[2] This Motion addresses only the Arbitration Provisions and not the underlying pleadings, because the Court's role in ruling on a motion to compel arbitration like this is limited to determining whether the parties agreed to arbitrate the claims at issue. *See, e.g., AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649–50 (1986). Nevertheless, the Complaint lacks merit for myriad reasons, which Temu will present to the arbitrator, and this Motion satisfies Temu's immediate obligation to respond to the Complaint. *See, e.g., Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 83 (2000) ("In lieu of an answer, petitioners filed a motion to compel arbitration, to stay the action, or, in the alternative, to dismiss."). Should the Court not compel arbitration, however, Temu respectfully reserves the right to and will file a substantive motion to dismiss or another responsive pleading in accordance with any schedule set by the Court. *See, e.g., Conrad v. Phone Dirs. Co.,* 585 F.3d 1376, 1383 n.2 (10th Cir. 2009) (motion to dismiss may be filed following denial of motion to compel arbitration). Temu does not waive any defenses to the Complaint by this Motion.



*Id.* ¶¶ 9-10 and Ex. A at p. 1. This screen (and others described below) would have appeared on her smartphone in a single uncluttered window, with an all-white background and with clearly legible text that was all roughly the same size (meaning that all of the text on the page was roughly the same size, between 13 to 15 pixels). *Id.* ¶ 9. Plaintiff was given the options to "Continue" setting up her account using her cell phone number or an email address, or to "Continue" using other pre-existing Google, Apple, Facebook, or Twitter accounts. *Id.* ¶ 10.

On this page, the text at the bottom appearing in close temporal and spatial proximity to the "Continue" buttons clearly stated: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." *Id.* ¶ 10 and Ex. A at p. 1. The bolded text represented functional clickable hyperlinks that, if Plaintiff had clicked them, would have taken her to a separate page for the Terms or Temu's privacy and cookie policy. *Id. See also id.* at Ex. B (Terms).

Plaintiff clicked the "Continue with Google" button, after clicking "Continue" on a pop-up message (*id.*, Ex. A at p. 2), was presented with another similarly uncluttered page so that she could finish setting up her Temu account that appeared on her smartphone as follows:



*Id.* ¶ 12 & Ex. A at p. 3. This page gave Plaintiff the option to click a button either associated with her existing Google account she was logged into on her phone, or to "Use another account." *Id.* At the bottom of this page, immediately underneath these two buttons, appeared

plainly legible text stating: "To continue, Google will share your name, email address, language preference, and profile picture with Temu. Before using this app, you can review Temu's **privacy policy** and **terms of service**." *Id*. (emphasis original). The bolded text on this page was also in a blue contrasting font, and represented clickable hyperlinks to Temu's Terms and its privacy and cookie policy (*i.e.,* the same ones on the first page, discussed above). *Id*. She clicked the top button on this page (to use her existing Google account), completing the signup process. *Id*. Importantly, Plaintiff could not have set up her Temu account without completing *all* these steps and pressing the necessary "Continue" buttons. *Id.* ¶¶ 6, 12, 16 & Ex. C thereto. Around the same time frame, she also consented to receiving marketing texts from or on behalf of Temu, via a separate screen. *Id.* ¶ 18 & Ex. D thereto.

This was not the only instance in which Plaintiff agreed to the Terms, however. Rather, on March 30, 2023, Plaintiff also logged on to her Temu account using her preexisting Apple account using her smartphone. *Id*. ¶¶ 14-15 and Exs. A & C thereto. This time, Plaintiff clicked the "Continue with Apple" button, but the format and process were essentially the same: *i.e.*, the same page with an all-white background, roughly the same size clearly-legible text, the "Continue" login buttons and, importantly, the same text underneath those login option buttons with the conspicuously-hyperlinked (bolded) Terms, informing her that "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." *Id.*

### B.    The Terms Mandate Individual Arbitration of All Disputes.

The conspicuously-hyperlinked Terms to which Plaintiff agreed unequivocally state any disputes she may have with Temu are subject to mandatory binding arbitration, strictly

on an individual basis. *See generally* Trinh Decl., Ex. B thereto. This fact is indisputable, and

Plaintiff was clearly on notice of the Arbitration Provisions. Indeed, at the very beginning,

in capitalized letters, the Terms in effect at that time and to which Plaintiff agreed stated:

> PLEASE BE AWARE THAT SECTION 20 OF THE TERMS BELOW …
> CONTAINS … AN AGREEMENT TO ARBITRATE WHICH REQUIRES,
> WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU
> AND WHALECO BE RESOLVED BY BINDING AND FINAL
> ARBITRATION. UNLESS YOU OPT OUT OF THE AGREEMENT TO
> ARBITRATE WITHIN 30 DAYS OF THE EFFECTIVE DATE OF THE
> AGREEMENT: (1) YOU AND WHALECO WILL ONLY BE PERMITTED
> TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST
> THE OTHER PARTY ON AN INDIVIDUAL BASIS, NOT AS A
> PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR
> REPRESENTATIVE ACTION OR PROCEEDING AND EACH OF US
> WAIVES OUR RIGHT TO PARTICIPATE IN A CLASS ACTION
> LAWSUIT OR CLASSWIDE ARBITRATION; AND (2) EACH OF US IS
> WAIVING OUR RIGHT TO PURSUE DISPUTES OR CLAIMS AND
> SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL.

*Id.,* Ex. B thereto at p. 1. Beyond this, "Section 20" (*i.e.,* the Arbitration Provisions) states

from the outset, in pertinent part and also in capitalized as well as bold letters, the following:

> PLEASE READ THE FOLLOWING ARBITRATION AGREEMENT IN
> THIS SECTION ("ARBITRATION AGREEMENT") CAREFULLY. IT
> REQUIRES YOU AND WHALECO TO ARBITRATE AGAINST ONE
> ANOTHER. **PLEASE BE AWARE THAT THIS SECTION 20 …**
> **INCLUDES AN AGREEMENT TO ARBITRATE WHICH REQUIRES,**
> **WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN**
> **YOU AND WHALECO BE RESOLVED BY BINDING AND FINAL**
> **ARBITRATION. THIS SECTION 20 ALSO CONTAINS A CLASS**
> **ACTION AND JURY TRIAL WAIVER.**

*Id.,* Ex. B thereto at pp. 16-17. The Arbitration Provisions also clearly state the following:

- "Subject to the terms of this Arbitration Agreement, you and Whaleco [*i.e.,* Temu]
  agree that ***any dispute, claim, or disagreement arising out of or relating in any way***
  ***to*** your access to or use of the Services, ***any communications you receive***, any
  products sold or distributed through the Services, or the Terms, including claims and
  disputes that arose between us before the effective date of the Terms (each, a
  'Dispute') will be resolved by binding arbitration…." *Id*., § 20.1 (emphasis added).

- "For purposes of this Arbitration Agreement, 'Dispute' will also include disputes that

arose or involve facts occurring before the existence of this or any prior versions of the Terms as well as claims that may arise after the termination of the Terms." *Id.*

- "**YOU AND WHALECO AGREE THAT … EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS.**" *Id*, § 20.4 (bolding and capitalization in original).

- "The Terms evidence a transaction involving interstate commerce; and notwithstanding any other provision herein with respect to the applicable substantive law, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., will govern the interpretation and enforcement of this Arbitration Agreement and any arbitration proceedings" and any arbitration would be conducted by the AAA under the AAA Rules. *Id.*, § 20.5.

- "The arbitrator shall have *exclusive authority to resolve any Dispute*, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, *including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement*," except certain disputes, including whether the standalone class action waiver provision in Section 20.4 above is enforceable. *Id*., § 20.7 (emphasis added).

## III.  <u>ARGUMENT</u>

The FAA "requires courts to enforce the bargain of the parties to arbitrate" and "leaves no place for the exercise of discretion by a district court…." *KPMG LLP v. Cocchi,* 565 U.S. 18, 21-22 (2011). As shown above and further discussed below, Plaintiff assented to the Terms, she was on notice of the Arbitration Provisions within, all arbitrability issues have been delegated to the arbitrator, and her OTSA claims are well within the scope of the Terms and she has no possible defenses to enforcement in any event. Thus, Plaintiff should be compelled to arbitrate her claims against Temu on an individual basis, as she agreed.

### A.  <u>A Valid and Binding Agreement to Arbitrate Exists in This Case.</u>

There can be no debate that a valid and enforceable arbitration agreement exists between Plaintiff and Temu, given the facts at bar here. *See* discussion at pp. 4-7, *supra*.

9

Of course, "[t]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997). While the FAA exclusively governs the enforceability of the Arbitration Provisions, state law governs the determination of whether an agreement to arbitrate exists in the first instance. *See, e.g., First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Bellman v. i3Carbon, LLC,* 563 F.App'x. 608, 612 (10th Cir. 2014).

Here, the Terms contain an express New York choice of law provision. *See* Trinh Decl., Ex. B at § 19.4.[3] In New York and Oklahoma—and everywhere else in the United States—mutual assent is a key element to contract formation, particularly in the arbitration agreement context. *See, e.g., Bassett v. Elec. Arts, Inc.,* 93 F. Supp. 3d 95, 104 (E.D.N.Y. 2015); *Hancock v. Am. Tel. & Tel. Co.,* 701 F.3d 1248, 1256 (10th Cir. 2012). Moreover, whether there is assent for contract formation purposes is evaluated ***objectively*** by looking at the totality of the circumstances and reasonable meaning of the parties' ***words and acts***, and not by their subjective unexpressed intentions or understandings. *See, e.g., Bazak Int'l Corp. v. Tarrant Apparel Group,* 378 F. Supp. 2d 377, 389 (S.D.N.Y. 2005) ("To determine

---

[3] Courts in the Second Circuit have honored choice-of-law clauses to determine the validity of an arbitration agreement, even where the parties dispute formation. *See, e.g., Klein v. Experian Info. Sols., Inc*., 2020 WL 6365766, at *4 (S.D.N.Y. Oct. 29, 2020) (citing *Errato v. Am. Exp. Co.,* 2019 WL 3997010, at *7 (D. Conn. Aug. 23, 2019)); *Lisa Cooley, LLC v. Native, S.A.,* 2021 WL 860591, at *3 (S.D.N.Y. Mar. 5, 2021) (citing, *inter alia, Bitumenes Orinoco, S.A. v. New Brunswick Power Holding Corp.,* 2007 WL 485617, at *8, 11 (S.D.N.Y. Feb. 13, 2007)). Courts in the Tenth Circuit have reached a contrary conclusion where formation is in question, and have conducted a choice-of-law analysis to determine which state's law to apply, notwithstanding any choice-of-law provisions. *See, e.g., Clary v. The Stanley Works*, 2003 WL 21728865, at *2 (D. Kan. July 24, 2003). This Court need not decide which state's law applies here, as New York and Oklahoma law appear to be in accord with respect to the well-accepted basic requirements for contract formation.

the presence of mutual assent, ... [t]he totality of parties' acts, phrases and expressions must be considered, along with the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." (internal quotation marks and citations omitted)); *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 769 (10th Cir. 2019) (holding the defendant's "actions following the execution of the documents" demonstrated the "existence of mutual assent"); *see also AllCity Famly Healthcare Ctr. Inc. v. Boss Surgical Grp., LLC*, 2014 WL 13000602, at *5 (E.D.N.Y. Apr. 23, 2014) ("If the contractual language and the parties' actions objectively show mutual assent to the arbitration clause, then all of plaintiff's other arguments must be resolved by the arbitrator" under the FAA.) (citing *Buckeye Check Cashing v. Cardegna,* 546 U.S. 440, 443–46 (2006)). As discussed above and further below Plaintiff's acts of registering her account and clicking "Continue" certainly show her assent.

Additionally, where a party disputes the existence of an agreement, "a court may grant a motion to compel arbitration [under the FAA] if there are no genuine issues of material fact regarding the parties' agreement." *Hancock,* 701 F.3d at 1261 (citations omitted). This means Temu "bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement; if it does so, the burden shifts to [Plaintiff] to raise a genuine dispute of material fact regarding the existence of an agreement." *Bellman*, 563 F.App'x. at 612. *See also Levine v. Vitamin Cottage Nat. Food Markets, Inc.,* 2021 WL 4439800, at *4 (D. Colo. Sept. 27, 2021) (Under the FAA, courts apply "'a standard similar to that governing motions for summary judgment,'" where the movant "'must present evidence sufficient to demonstrate an enforceable arbitration agreement'" and then "the

burden shifts to [the non-movant] 'to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56.'") (quoting *Stein v. Burt-Kuni One, LLC,* 396 F. Supp. 2d 1211, 1213 (D. Colo. 2005)).

Further, consistent with the strong federal policy in favor of arbitrations generally, Temu only bears the burden of proving the existence of a valid arbitration agreement by a ***preponderance*** of the evidence. *See, e.g., Melnick v. TAMKO Bldg. Prod. LLC,* 2022 WL 4355299, at *4 (D. Kan. Sept. 20, 2022) (collecting cases, compelling arbitration).[4] Thus, it is Plaintiff (not Temu) who bears the burden of proving the Arbitration Provisions are unenforceable. *See Green Tree,* 531 U.S. at 91. But Plaintiff cannot meet this burden here.

Indeed, as one court aptly noted, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). Further, as to online contracts, courts have widely recognized "[a]ny reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider." *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254,

---

[4] The Supreme Court has held that arbitration agreements must be analyzed against the backdrop of the FAA, which reflects a "liberal federal policy favoring arbitration," and "[a]ny doubts concerning the scope of arbitrable issues [are to] be resolved in favor of arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (internal quotations omitted); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *accord Marmet Health Care Ctr., Inc. v. Brown,* 565 U.S. 530, 533 (2012). That is because Congress enacted the FAA "to reverse longstanding judicial hostility to arbitration agreements and to place them on the same footing as other contracts." *Green Tree*, 531 U.S. at 89 (internal quotation and alterations omitted). Therefore, the FAA is not discretionary and ***mandates*** that courts direct parties to proceed to arbitration on issues subject to their agreement. *See also Concepcion*, 563 U.S. at 344 ("The 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'").

278 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020) (quoting *Selden v. Airbnb, Inc.*,

2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) *aff'd*, 4 F.4th 148 (D.C. Cir. 2021)).

As to online arbitration agreements in particular, courts applying Oklahoma law or

New York law (among many others across the country)[5] have generally recognized two main

types: "clickwrap" and "browsewrap." A "clickwrap" agreement, which is the type Temu

submits is most relevant here,[6] is where a user like Plaintiff has to affirmatively click a button

and/or check a box on a website or app, and "the [arbitration] agreement is 'presented via a

hyperlink to a page separate from the one containing the box or button manifesting assent.'"

*Davis v. USA Nutra Labs,* 303 F. Supp. 3d 1183, 1190–91 (D.N.M. 2018) (citing *Bassett v.

Elec. Arts Inc.,* 2015 WL 1298644, at *4 (E.D.N.Y. Feb. 9, 2015) (collecting cases)). *See

also Nichols v. Google LLC,* 2023 WL 5938917, at *2–4 (D. Colo. Sept. 12, 2023) ("Courts

have held that clicking 'accept' to the terms of a clickwrap agreement, even when the terms

do not appear on the same screen as the 'accept' button but are available with the use of a

hyperlink, is sufficient to form a contract.") (collecting cases, including *Hancock*); *Nardo v.*

---

[5] As the Tenth Circuit noted, Oklahoma "courts have not discussed [clickwrap agreements] in depth" beyond "a few brief references." *Hancock,* 701 F.3d at 1256. That is true today.

[6] Courts in this Circuit have largely treated online agreements like Temu's (including those cited herein and others) as "clickwrap" agreements, to the extent the user has to click a button to agree to the terms. Some have held this is a "hybrid" or "sign-in" wrap agreement, because the terms are not on the same screen as the button and/or the user does not need to click a box in addition to a button. *See, e.g., Beattie v. TTEC Healthcare Sols., Inc.,* 2019 WL 2189481, at *2 (D. Colo. May 21, 2019) (citing *Petrie v. GoSmith, Inc.,* 360 F. Supp. 3d 1159, 1161 n.1 (D. Colo. 2019)); *Route App, Inc. v. Heuberger,* 2022 WL 2316377, at *3 (D. Utah June 28, 2022). Either way, the user is still affirmatively manifesting assent by ***clicking*** something. In contrast, a "browsewrap" is where the terms are on the website somewhere and the user is agreeing to them just by continuing to use the website. *See Route App., Inc.* 2022 WL 2316377, at *3. That is not an issue here. And no matter the label applied in this case, the Terms and Arbitration Provisions within are valid and enforceable.

*HomeAdvisor, Inc.,* 2022 WL 17547940, at *1–6 (D. Colo. July 27, 2022), *report and rec. adopted,* 2022 WL 17547938 (Aug. 11, 2022) (finding agreement was a "clickwrap" where, as here, the plaintiff clicked a button to manifest assent to hyperlinked terms).

This case involves a "clickwrap" agreement, whereby Plaintiff was required to click a "Continue" button to affirmatively indicate her assent to the hyperlinked Terms containing the Arbitration Provisions, both when setting up her Temu account via the App and later when accessing her account on the App or the Website. *See* discussion at pp. 4-7, *supra*. Courts have held such agreements are valid and enforceable where, as here: (1) "the user is required to affirmatively acknowledge the agreement before proceeding with use" of the website or app or (2) the website or app "puts a reasonably prudent [internet] user on inquiry notice of the terms of the contract," which "depends on the design and content of the website and the agreement's webpage." *Nguyen*, 763 F.3d at 1176-77. *See also Hancock,* 701 F.3d at 1256 ("Courts evaluate whether a clickwrap agreement's terms were clearly presented to the consumer, the consumer had an opportunity to read the agreement, and the consumer manifested an unambiguous acceptance of the terms."); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (affirming order compelling arbitration and holding inquiry notice is satisfied where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms") (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)). Whether Plaintiff read the Terms is irrelevant. *See Hancock*, 701 F. 3d at 1258.

*Davis v. USA Nutra Labs* is instructive on this point. There, the district court enforced a clickwrap arbitration agreement where, similar to Temu's here, (i) the plaintiff clicked a button that said "Complete Order"; (2) below that button, there was a sentence stating: "'[b]y clicking Complete Order I accept the Terms and Conditions ....'"; and (3) the phrase "Terms and Conditions" was conspicuously hyperlinked, such that plaintiff could view the applicable terms containing the arbitration provisions. 303 F. Supp. 3d at 1190. Thus, the *Davis* court held "[a] reasonably prudent internet user would have known of the existence of the terms in [the] Terms of Use, ... including the arbitration provision." *Id.* at 1191.

Myriad other courts have reached the same conclusion in similar cases and, as such, have routinely enforced online arbitration agreements like the one at bar. In fact, another court recently enforced ***Temu's*** Arbitration Provisions where a plaintiff assented to the Terms in nearly the same fashion as Plaintiff did here. *See Fontanez v. Whaleco, Inc.*, Case No. 53-2023CA-000374, slip op. at 3, 5 (Fla. Cir. Ct. Aug. 29, 2023) (attached hereto as Exhibit 1) (holding that "by clicking 'Continue,' [plaintiff] assented to [Temu's] Terms of Use that contained an arbitration clause").[7] *See also Beattie*, 2019 WL 2189481, at *2 (compelling arbitration where defendant submitted evidence showing plaintiffs manifested

---

[7] The only minor difference in *Fontanez* was that the plaintiff there clicked the "Continue with Apple" button initially, whereas in this case Plaintiff clicked the "Continue with Google" and later the "Continue with Apple" buttons, manifesting her assent to the Terms each time. *Cf. Johnson v. Whaleco, Inc.,* Case No. 5:23-cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023), Dkt. 29 (denying motion to compel arbitration involving a different Temu sign-up page where the "Terms of Use" were neither bolded nor underlined, and thus were not distinguishable as a hyperlink). Moreover, and respectfully, *Johnson* was wrongly decided for several reasons, including that the court did not recognize the existence of hybrid-wrap agreements, as other courts in that circuit and elsewhere have. In short, *Johnson* is irrelevant.

assent by clicking "Accept" button on an opt-in page); *Clements v. Alto Tr. Co.,* 2023 WL 5002472, at *7 (D.N.M. Aug. 4, 2023) (enforcing a clickwrap agreement where there was no evidence suggesting plaintiff "was unable to see or click on the hyperlinks" to the terms, holding "a reasonably prudent internet user would have known to follow the links and read the documents to which they were agreeing"); *Graf v. Match.com, LLC*, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (ruling that users of Match.com's website agreed to an arbitration provision within its terms "when they clicked on a 'Continue' or other similar button on the registration page where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review"); *Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) ("When Starke clicked 'Shop Now,' he was informed that by doing so, and giving his email address, 'you agree to the Terms of Membership for all Gilt Groupe sites.' Regardless of whether he actually read the contract's terms, Starke was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them."). This Court should rule similarly here.

Though Plaintiff may argue otherwise in response to this Motion, the presence of other "Continue" buttons, in addition to the "Continue with Google" or "Continue with Apple" buttons that Plaintiff ultimately pressed, or that the operative contracting language was at the bottom of the same screen, is of no moment. In *Walker v. Neutron Holdings, Inc.,* for example, the user went through a substantially similar process, whereby (1) "[t]he User Agreement notice appear[ed] immediately below the two buttons on the sign-in page, which

16

prompt the user to fill in their phone number and select 'NEXT' or select 'Continue with Facebook'" on an all-white background; (2) the operative contracting text at the bottom of the page (under the second button) stated "By signing up, I confirm that I am at least 18 years old, and that I have read and agreed to Lime's User Agreement & Terms of Service"; and (3) the "User Agreement" and "Terms of Service" were likewise in a contrasting bold text, albeit presented in a much smaller font than Temu's Terms. 2020 WL 703268, at *3 (W.D. Tex. Feb. 11, 2020). Considering all this, the *Walker* court held "a reasonable user would view the [defendant's] sign-in screen and see that the User Agreement is part of the offer to proceed with the transaction by clicking 'NEXT' or 'Continue with Facebook.'" *Id*. at *4. Other courts have reached the same conclusion. *See, e.g., Babcock v. Neutron Holdings, Inc.*, 454 F. Supp. 3d 1222, 1230–34 (S.D. Fla. 2020) (ruling similarly as *Walker* on the same process); *Selden*, 2016 WL 6476934, at *2 (holding plaintiff was on inquiry notice where he was presented with buttons to "Sign up with Facebook," "Sign up with Google," and "Sign up with Email" and the operative text with hyperlink appeared at the bottom); *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 78-79 (2d Cir. 2017) (holding an "uncluttered" page like Temu's, where there were additional buttons but no "need to scroll beyond what is immediately visible to find notice of the Terms of Service," was enough to put a reasonably prudent user on notice the terms would govern the parties' relationship). In short, these cases (and others) show the assent text need ***not*** be immediately next to the button, and only needs to be presented in a clear and legible fashion in close spatial and temporal proximity to it.

   As all this is applied here, the Terms containing the Arbitration Provisions were

conspicuously hyperlinked in a contrasting bold font, presented in close spatial and temporal proximity to the "Continue" buttons Plaintiff had to click to continue signing up for her account on the App or when logging on later. *See* Trinh Decl., ¶¶ 7-17 and Exs. A & C. The operative assent language—which was presented to her on the same uncluttered all-white page, in an easy-to-read font that was roughly the same size as all the other text on the page— unambiguously stated: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." *Id*. The Terms themselves were presented in plain English and not in complex "legalese," clearly indicating from the outset she was agreeing to arbitrate "any dispute" against Temu on an individual basis and waiving her class action rights. *See* discussion at pp. 7-9, *supra*. And Plaintiff could not have proceeded without clicking one of the "Continue" buttons, thereby demonstrating her assent to the Terms. *See* Trinh Decl., ¶ 16. Again, myriad courts have enforced such arbitration agreements in similar cases. *See*, *e.g., Fontanez*, *Walker, Babcock, Selden*, *Meyer*, *supra*. The result should be the same here.

In sum, by voluntarily clicking one of the "Continue" buttons on the App during registration and later when accessing her account using essentially the same process, Plaintiff unambiguously manifested her assent to the Terms and the Arbitration Provisions, she had actual (or at least "inquiry") notice of the Terms, and it does not matter if she ever read them. Therefore, the Court should find that a valid and enforceable agreement to arbitrate exists in this case, in accordance with the vast weight of applicable federal authority cited above.

**B.    The FAA Applies to the Arbitration Provisions of the Terms.**

The FAA applies here because the Arbitration Provisions reflect a written provision

in a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. The Supreme Court has interpreted "involving commerce," as used in the FAA, to be "the functional equivalent of the more familiar 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2002). Thus, Section 2 of the FAA is broadly interpreted and applies to any transaction ***directly or indirectly*** affecting interstate commerce. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 (1967); *Citizens Bank*, 539 U.S. at 56-57.

In the present case, the FAA unquestionably applies to the Arbitration Provisions at issue because they appear in a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Per the Complaint, Plaintiff is an Oklahoma resident. *See* Dkt. 1-1, ¶ 4. Plaintiff acknowledges Temu runs a global "online" business, and alleges Temu is incorporated in Delaware and maintains its principle place of business in Massachusetts. *Id*. ¶ 5. She further alleges that Temu made "commercial telephonic sales calls" to other "persons dispersed throughout Oklahoma…." *Id*. ¶ 28. Thus, Temu is engaged in business in multiple states (indeed, nationally) and, according to Plaintiff's own pled allegations, the text messages at issue directly concern interstate "commerce." Moreover, the Terms themselves expressly provide that "[t]he Terms evidence a transaction involving interstate commerce" within the meaning of the FAA. Trinh Decl., Ex. B at § 20.5. Therefore, the FAA applies in this case.

**C.    <u>Any Arbitrability Disputes Have Been Delegated to the Arbitrator.</u>**

"On a motion to compel arbitration, the district court's role is to determine (1) whether

the parties have entered into a valid agreement to arbitrate, and (2) whether the dispute in question falls within the scope of that agreement." *Davis,* 303 F. Supp. 3d at 1189. *See also Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1105 (10th Cir. 2020). However, it is well accepted that "parties can agree to arbitrate 'gateway' questions of 'arbitrability'" such as "whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). Therefore, once the Court determines an agreement was formed (and one was certainly formed here), and "unless [a plaintiff] challenge[s] [a] delegation provision ***specifically***, [a court] must treat it as valid … and ***must enforce it*** … leaving any challenge to the [overall] validity of the [agreement to arbitrate] *as a whole* for the arbitrator." *Id*. at 72 (emphasis added).[8] In short, where the parties "clear[ly] and unmistakab[ly]" delegate these questions to the arbitrator, *id*. at 79, "a court may not override the contract" and "possesses no power to decide the arbitrability issue"—***even if*** it "thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S.Ct. 524, 529 (2019).

Moreover, "[v]irtually every [federal] [C]ircuit to have considered the issue has

---

[8] Put differently, "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate" because "'[a]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.'" *Rent-A-Center,* 561 U.S. at 70-71, 84 (quoting *Buckeye,* 546 U.S. at 445 (citing 9 U.S.C. § 2)). *See also Fedor,* 976 F.3d at 1106 ("[W]hile the *Rent-A-Center* Court held that a litigant must specifically challenge the delegation clause in order to allow courts to determine the validity of an arbitration contract as a whole, its holding does not apply in situations where a party alleges that no agreement 'was ever concluded' between the parties.") (quoting 561 U.S. at 70 n.2); *Naizgi v. HSS, Inc.,* 2023 WL 4933183, at *2 (D. Colo. Aug. 2, 2023) (recognizing unconscionability is not a contract formation issue and is a delegable arbitrability issue) (citing, *inter alia, Rent-A-Center*).

determined that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see also Pacelli v. Augustus Intel., Inc.*, 459 F. Supp. 3d 597, 608 (S.D.N.Y. 2020) (holding that the incorporation of AAA Rules into an arbitration agreement is—"***standing alone***—'clear and unmistakable evidence' of intent to delegate" all arbitrability issues to the arbitration) (emphasis added). Such is true here.

As noted above, the Arbitration Provisions expressly incorporate the AAA Rules. *See* Trinh Decl., Ex. B at § 20.5. Beyond this, the Arbitration Provisions make clear that the parties delegated all arbitrability issues to the arbitrator: "The arbitrator shall have ***exclusive authority to resolve any Dispute***, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, ***including the enforceability, revocability, scope, or validity of the Arbitration Agreement*** or any portion of the Arbitration Agreement…." *Id.*, § 20.7 (emphasis added). Thus, by incorporating the AAA Rules as well as expressly, the parties have "clearly and unmistakably" placed the issue of arbitrability squarely within the exclusive jurisdiction of the arbitrator, not this Court.

### D.    <u>The Arbitration Provisions are Properly Enforced Under the FAA.</u>

At this point, the Court need not rule further and should grant this Motion. However, should the Court reach the question of arbitrability despite that issue having been clearly delegated to the arbitrator (and it should not), the Arbitration Provisions in the Terms constitute a valid and enforceable contract, mandating this dispute be arbitrated individually.

Again, Section 2 of the FAA provides arbitration provisions in "a contract evidencing

a transaction involving commerce … ***shall be valid, irrevocable, and enforceable***, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). If a court finds a valid agreement to arbitrate exists and it encompasses the dispute, the FAA ***requires*** the court to refer the matter to arbitration. *See Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 221 (1985) (courts must "rigorously enforce agreements to arbitrate"). Once a court determines a claim is subject to arbitration, it lacks authority to address its merits. *See, e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406 (1967); *AT&T Techs., Inc.*, 475 U.S. at 649-50. The party resisting arbitration bears the burden of showing that the arbitration agreement is invalid or does not encompass the claims at issue. *See Green Tree*, 531 U.S. at 91-92. Plaintiff cannot meet this.

### 1.    Plaintiff's OTSA Claims Against Temu In This Case Fall Squarely Within the Scope of the Arbitration Provisions.

As discussed at length above, an arbitration agreement was certainly formed here. *See* discussion at pp. 9-18, *supra*. Further, though Plaintiff may try to argue her OTSA claims are beyond the scope of the Arbitration Provisions, that would be unavailing on these facts.

Where an arbitration clause is broadly worded, like Temu's, the "presumption of arbitrability" of the claim often carries the day, and courts will generally find that the claim at bar falls within its scope. *Smith v. Fed Ex,* 2022 WL 2819142, at *4–6 (W.D. Okla. July 19, 2022) (citations omitted). Thus, arbitration clauses covering "any" dispute "arising from" or "relating in any way" to an agreement cast the widest net, and cover any dispute between the contracting parties, regardless of whether the dispute relates to the agreement itself. *Id.*

Here, the Arbitration Provisions at issue broadly cover "***any dispute, claim, or***

*disagreement arising out of or relating in any way to your access to or use of the Services*, ***any communications you receive***, any products sold or distributed through the Services, or ***the Terms***…." Trinh Decl., Ex. B at § 20.1 (emphasis added). Further, the word "Services" is defined in the Terms as including Temu's "applications, products, services and websites" specifically. *Id.* at p. 1. As such, on their face, the Arbitration Provisions cover not only "any disputes … relating in any way" to the Terms generally, but also specifically to the App and Website that Plaintiff used to request text messages from Temu (*see id.* at Exs. C & D) and "any communications" received from Temu specifically. It is indisputable Plaintiff's OTSA claims rest ***entirely*** on alleged "communications" from or on behalf of Temu. *See* Dkt. 1-1.

Given the foregoing, there is no doubt that Plaintiff's OTSA claims fall entirely within the broad scope of the Arbitration Provisions here. But to the extent any ambiguity exists on this point, and there certainly is none, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25; *see also Marmet,* 565 U.S. at 533 (the FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution"). Thus, the Court should compel Plaintiff to arbitrate her claims.

## 2. Plaintiff Has No Valid Arbitrability Challenges.

Plaintiff cannot credibly argue that there is any basis to invalidate the Arbitration Provisions, either. As is plainly evident, the Arbitration Provisions (i) are fair and balanced, (ii) enforceable by either party, (iii) not unreasonably favorable to Temu (if anything, they favor Plaintiff), (iv) do not foreclose OTSA claims (and in fact specifically contemplate them), and (v) were presented to Plaintiff in plain English and not complex legalese—all vis-

à-vis a standard "clickwrap" internet agreement like countless other courts have enforced. *See* discussion at pp. 9-18, *supra*. Moreover, Plaintiff not only was given multiple opportunities to review the Arbitration Provisions, but also had the right to opt-out and was notified of this right on ***the very first page*** of the Terms. *See* Trinh Decl., ¶¶ 7-17 and Ex. B thereto at p. 1. Therefore, the Arbitration Provisions should be enforced. *See, e.g., Carr v. Credit One Bank*, 2015 WL 9077314, at *3 (S.D.N.Y. Dec. 16, 2015) (arbitration clause not substantively unconscionable where it did not foreclose TCPA claims, was enforceable by either party, and permitted appeals); *Graf,* 2015 WL 4263957, at *5 (arbitration provision was not substantively unconscionable where it conspicuously appeared in capitalized letters and was not overly harsh or oppressive); *Ostreicher v. TransUnion, LLC,* 2020 WL 3414633, at *7, n.8 (S.D.N.Y. June 22, 2020) (arbitration provision was not procedurally unconscionable where plaintiff given the opportunity to opt-out). *See also Concepcion*, 563 U.S. at 346-47 (enforcing arbitration provision in an alleged "adhesion" contract, noting "the times in which consumer contracts were anything other than adhesive are long past.").

### E.    The Arbitration Must Proceed Solely on an Individual Basis.

Although Plaintiff seeks class treatment in her Complaint, the Arbitration Provisions make abundantly clear that Plaintiff is only entitled to bring an individual arbitration; and, moreover, the Terms contain a separate, standalone class action waiver. *See* Trinh Decl., Ex. B, § 20.4. It is well-settled that standalone class action waivers in arbitration agreements like the foregoing are enforceable. *See, e.g., Concepcion*, 563 U.S. at 352; *Am. Express Co. v. Italian Colors Rest.*, 133 S.Ct. 2304, 2308-12 (2013); *DIRECTV, Inc. v. Imburgia*, 136 S.Ct.

463, 471 (2015). Moreover, it is axiomatic "courts and arbitrators must give effect to the contractual rights and expectations of the parties." *Stolt-Nielsen v. Animalfeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal punctuation omitted). This Court should rule similarly, and dismiss Plaintiff's class claims accordingly, regardless of whether or how the Court rules on any arbitrability issues (if at all). *See also Rent-A-Center,* 561 U.S. at 70-71 (noting an arbitration provision is severable from the remainder of the contract) (applying *Buckeye*).

### F.   <u>Plaintiff's Lawsuit Should Be Dismissed in Its Entirety.</u>

Finally, rather than entering a stay, this Court may—and indeed should—<u>dismiss</u> this entire case in favor of arbitration. Courts in this Circuit have recognized that when all the claims at issue are subject to arbitration, dismissal is appropriate. *See, e.g., THI of New Mexico at Hobbs Ctr., LLC v. Spradlin,* 893 F. Supp. 2d 1172, 1190 (D.N.M. 2012), *aff'd*, 532 F. App'x 813 (10th Cir. 2013) ("Neither Section 3 nor Section 4 of the FAA requires the Court to stay this case when the only issue before it is whether to compel arbitration, and that issue has been resolved….") (citations omitted). Here, it is clear that all the claims in Plaintiff's Complaint must be arbitrated. As shown above, the Arbitration Provisions in the Terms broadly encompass Plaintiff's alleged receipt of "communications" from or on behalf of Temu. That is the entire basis for her OTSA claims. Thus, dismissal is more appropriate.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss (or alternatively stay) this entire case in favor of arbitration, and order Plaintiff to submit to binding individual arbitration.

Dated: November 15, 2023

Respectfully submitted by,

Smith Gambrell & Russell LLP

*/s/ Robert A. Stines*
Robert A. Stines (admitted *pro hac vice*)
Florida Bar No. 78447
201 N. Franklin Street, Suite 3550
Tampa, Florida 33602
T: 813-488-2920
Email: rstines@sgrlaw.com
        vwilliams@sgrlaw.com
        daigotti@sgrlaw.com

John W. McGuinness (*pro hac* to be requested)
A. Paul Heeringa (*pro hac* to be requested)
MANATT, PHELPS & PHILLIPS LLP
151 N. Franklin Street, Ste. 2600
Chicago, Illinois 60606
T: 312-529-6300
Email: jmcguinness@manatt.com
        pheeringa@manatt.com

John A. Burkhardt, OBA #1336
SCHAFFER HERRING PLLC
7134 S. Yale, Ste. 300
Tulsa, Oklahoma 74136
T: 918-856-5378
Email: john.burkhardt@schafferherring.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2023, a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system, which will send a notice to all counsel of record.

*/s/ Robert A. Stines*
Robert A. Stines
