## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| HEATHER SMITH, individually and on behalf of all others similarly situated, | Case No. 5:23-cv-00559-D |
| Plaintiff, | |
| v. | CLASS ACTION |
| WHALECO INC. DBA TEMU, | |
| Defendant. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION TO COMPEL ARBITRATION

Submitted by:

Mary Quinn-Cooper, OBA # 11966
Kathy R. Neal, OBA #674
McAFEE & TAFT, P.C.
Williams Center Tower II
Two W. Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone:  918-587-0000
Facsimile:  918-599-9317
Maryquinn.cooper@mcafeetaft.com
Kathy.neal@mcafeetaft.com

E. Powell Miller
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone:  248-841-2200
epm@millerlawpc.com

*Counsel for Plaintiff and the Putative Class*

## <u>TABLE OF CONTENTS</u>

I.     **INTRODUCTION** ..........................................................................................1

II.    **THE TEMU FLOW** .....................................................................................2

III.    **ARGUMENT** ...............................................................................................5

       **a.    Defendant fails to establish that any agreement, much less an agreement to arbitrate, was ever formed between the parties** ...............................................6

IV.    **CONCLUSION** ...........................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Applebaum v. Lyft, Inc.*,
   263 F. Supp. 3d 454 (S.D.N.Y. 2017) .................................................................. 20

*Berkson v. Gogo LLC*,
   97 F. Supp. 3d 359 (E.D.N.Y. 2015) ............................................................... 10,20

*Boler v. Sec. Health Care, L.L.C.*,
   336 P.3d 468 (Okla. 2014) ................................................................................. 25

*Cullinane v. Uber Techs., Inc.*,
   893 F.3d 53 (1st Cir. 2018) ..................................................................... 15, 18, 21

*Dollar Rent A Car Sys., Inc. v. P.R.P. Enter's., Inc.*,
   No. 01 CV 698 JHP FHM, 2006 WL 1266515 (N.D. Okla. May 8, 2006) ............. 6

*Dunbar Eng'g Corp. v. Rhinosystems, Inc.*,
   232 P.3d 931 ........................................................................................................ 7

*First Nat'l Bank & Trust Co. of El Reno v. Stinchcomb*,
   734 P.2d 852 (Okla.1987) ..................................................................................... 7

*Forby v. One Techs., LP*,
   2016 WL 1321194 (S.D. Ill. Apr. 5, 2016) ......................................................... 10

*Hancock v. Am. Tel. & Tel. Co.*,
   701 F.3d 1248 (10th Cir. 2012) ......................................................................... 6, 7

*Hart-Parr Co. v. Brockreide*,
   1920 OK 100, 77 Okla. 277, 188 P. 113 ............................................................... 7

*Howard v. Ferrellgas Partners, L.P.*,
   748 F.3d 975 (10th Cir. 2014) ............................................................................ 25

*Jacks v. CMH Homes, Inc.*,
   856 F.3d 1301 (10th Cir. 2017) .......................................................................... 25

*Lopez v. Terra's Kitchen, LLC*,
   331 F. Supp. 3d 1092, 1101 (S.D. Cal. 2018) .................................................... 14

*Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*,
    272 Fed. Appx. 782 (11th Cir. 2008) .........................................................7

*Meyer v. Uber Technologies, Inc.*,
    868 F.3d 66 (2d Cir. 2017) ..........................................8, 9, 10, 15, 21, 23

*Nat'l Env't Serv. Co. v. Ronan Eng'g Co.*,
    256 F.3d 995 (10th Cir. 2001) ................................................................7

*Nguyen v. Barnes & Noble*,
    763 F.3d 1171 (9th Cir. 2014) ................................................................8

*Ragab v. Howard*,
    841 F.3d 1134 (10th Cir. 2016) ..............................................................6

*Redbox Automated Retail, Inc.*,
    No. 19-cv-01993 (ECF No. 32) (N.D. Ill. Mar. 25, 2021) ...............16, 19

*Route App., Inc. v. Heuberger*,
    No. 2:22-CV-291-TS-JCB, 2022 WL 2316377
    (D. Utah June 28, 2022) ....................................................................9, 13

*Selden v. Airbnb, Inc.*,
    4 F.4th 148 (D.C. Cir. 2021) ..................................................................9

*Sgouros v. TransUnion Corp*,
    817 F.3d 1029 (7th Cir. 2016) ................................................................8

*Sgouros v. TransUnion Corp.*,
    2015 WL 507584 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d 1029
    (7th Cir. 2016) ......................................................................................8

*Soliman v. Subway Franchisee Advert. Fund Tr. Ltd.*,
    442 F. Supp. 3d 519, 525 (D. Conn. 2020), *aff'd and remanded*,
    999 F.3d 828 (2d Cir. 2021) .................................................................14

*Specht v. Netscape Commc'ns Corp.*,
    306 F.3d 17, 29–30 (2d Cir. 2002) ......................................................14

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
    925 F.2d 1136 (9th Cir. 1991) ................................................................6

*TopstepTrader, LLC v. OneUp Trader, LLC*,
    2018 WL 1859040 (N.D. Ill. Apr. 18, 2018) ........................................................... 9

*Vernon v. Qwest Commc'ns Int'l, Inc.*,
    857 F. Supp. 2d 1135 (D. Colo. 2012) .................................................................... 6

*Voss v. City of Okla. City*,
    618 P.2d 925 (Okla. 1980) ................................................................................... 25

**Statutes**

Federal Arbitration Act,
    9 U.S.C. §§ 1-16 ................................................................................................. 1

Oklahoma's Telephone Solicitation Act,
    Okla. Stat. tit. 15, § 775C.1, *et seq* ...................................................................... 1

**Treatises**

17B C.J.S. Contracts § 931 ......................................................................................... 6

Restatement (Second) of Contracts § 19(2) (1981) ....................................................... 7

Plaintiff Heather Smith hereby files her opposition to Defendant Whaleco, Inc. d/b/a TEMU's ("Temu") Motion to Compel Arbitration (hereinafter "the Motion") (ECF No. 33-1) and states as follows:

## I.    INTRODUCTION

In this consumer class action, Plaintiff, individually and on behalf of a proposed class, alleges a single claim against Defendant for transmitting unsolicited marketing text messages to her cellular telephone in violation of Oklahoma's Telephone Solicitation Act, Okla. Stat. tit. 15, § 775C.1, *et seq.* ("OTSA").  Defendant moves to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA").

The Motion fails because Defendant has failed to establish that the parties formed an agreement (much less an agreement to arbitrate). Defendant now contends that by creating a user account on Defendant's mobile app on December 30, 2022, Plaintiff agreed to Defendant's "Terms of Use" and its incorporated arbitration provision. However, as recently held in *Johnson v. Whaleco, Inc.*, Case No. 5:23-cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023) (attached hereto as Ex. A), the initial registration form that Defendant says Plaintiff completed here fails to clearly and conspicuously notify users that by clicking the "Continue" button at the top middle of the page to advance with the registration flow, site users are agreeing to be bound by the Terms of Use (including its incorporated arbitration provision).  This is because the only mention of the Terms of Use on the initial registration form appeared in small, lightly colored font well beneath the massive, bright orange "Continue" button, buried underneath several other brightly colored buttons having nothing to do with Plaintiff's registration on the app.   The second page Plaintiff

encountered did not advise Plaintiff at all that she was assenting to Defendant's Terms of Use at all.    In other words, rather than placing the Terms of Use hyperlink in visual proximity to the button, Defendant purposefully presented the hyperlink at the bottom of the page, in small inconspicuous light grey color set against a white background, so that visitors like Plaintiff would not see the link and not be dissuaded from registering on the site.    The second page (which along with the first is collectively referred to herein as the "Temu Flow") equally failed to communicate that clicking the Continue button amounted to assent to Temu's Terms of Use.  Nor does it matter that Plaintiff may have used the app more than once.

Based on Defendant's app's presentation of the Terms of Use, no consumer who used the Temu Flow received clear and conspicuous notice that by continuing with the registration flow she or he was assenting to the Terms of Use. Because the registration flow failed to adequately notify anyone who used the Temu App of the Terms of Use that appeared below the "Continue" button, Defendant cannot establish that Plaintiff (or any other consumer) objectively manifested their assent to be bound by the Terms of Use by clicking that button.  Accordingly, the motion should be denied.

## II.    THE TEMU FLOW

Defendant now contends that based on its business records Plaintiff registered a Temu account on December 30, 2022 via the Temu Android app, and thereby consented to arbitration. *See* Declaration of Michael Trinh (ECF No. 33-3 (the "Trinh Decl.") ¶ 8).

The Trinh declaration asserts that Plaintiff's registration occurred via the Temu Flow in three steps.  First, Plaintiff allegedly encountered the following initial registration

interface:



(*Id.*, Ex. A).

To begin registering an account via the mobile app, visitors have the option to either: (1) input an email address or phone number at the top of the initial registration screen and then press the large, bright orange "Continue" button located in the upper third of the screen; or (2) click one of the four buttons on the bottom half of the pop-up screen (beneath the orange "Continue" button), which then allows the visitor to register with the site via a Google, Facebook, Twitter, or Apple account. At the top of the screen are two icons set

against an off-white background which in bold black characters promote "**Free shipping**"
and "**Free returns**". The sentence containing the hyperlink to the Terms of Use appears at
the very bottom of the second section of the interface, beneath the four "other ways" to
register.   The sentence "By continuing, you agree to our Terms of Use and Privacy &
Cookie Policy" appears in a light grey color in smaller font size than any of the text on the
buttons above set against a white background.   The Terms of Use hyperlink is bolded, but
still in light grey text set against a white background and is not underlined.

  According to Defendant, Plaintiff clicked "Continue with Google" and encountered
the following screen (Trihn Decl. Ex. A):



  A user has two options to proceed.  The first allows the user to proceed with his or
Google account.   Second allows a user to "use another account".   At the bottom of the

screen, separated from the button which allows the user to proceed using a Google account it states "To continue, Google will share your name, email, address, language preference, and profile picture with Temu. Before using this app you can review Temu's privacy policy and terms of service." Though the words privacy policy and terms of service are in blue, the user is never advised that they are affirmatively *agreeing* to Temu's privacy policy or terms of service.

Defendant asserts that once an account is established using the Temu Flow, a user sees the same three screens with every login. (Trihn Dec. ¶ 14). Defendant claims Plaintiff logged in one other time with an Apple account. (*Id.*).

### III.    ARGUMENT

Defendant moves to compel Plaintiff to arbitration, arguing that Plaintiff agreed to the Terms of Use, and its incorporated arbitration provision, when she registered via its mobile app or in the subsequent login she allegedly made using the same flow. This argument fails because Defendant cannot establish, given the Temu Flow's configuration and appearance, that Plaintiff (or any other visitor) objectively manifested their assent to the Terms of Use by clicking the "Continue" button or by selecting their Google account either screen at registration or login. Mutual assent is a necessary element to establishing that an agreement to arbitrate was formed between the parties, and without it there is no basis for Defendant to compel arbitration in this case.

Plaintiff disputes that New York law applies based on a choice of law provision in Defendant's Terms and Conditions because Plaintiff did not assent to these Terms and Conditions. *See Schnabel v. Trilegiant Corp*., 697 F.3d 110, 119 (2d Cir. 2012) ("Applying

the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.").  The Court in *Johnson v. Whaleco, Inc.*, Case No. 5:23-cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023) similarly found that Florida law – the law of the forum and where Plaintiff resided – applied based on the same logic that the New York choice of law provision could not be deemed to apply until the court found the formation of a valid contract. 2023 U.S. Dist. LEXIS 184104, *4.  Here Oklahoma law plainly controls.

"[W]hether a party agreed to arbitration is a contract issue, meaning arbitration clauses are only valid if the parties intended to arbitrate." *Ragab v. Howard*, 841 F.3d 1134, 1137 (10th Cir. 2016).  Thus, arbitration can be compelled "[o]nly when there is no genuine issue of fact concerning the formation of the agreement." *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012), *aff'd.*, 925 F. Supp. 2d 1185 (D. Colo. 2013) (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991)).  "If there is doubt as to whether such an agreement exists," Defendant has failed to carry its burden and the Motion must be denied. *See id*. at 1141.

### (a)    Defendant fails to establish that any agreement, much less an agreement to arbitrate, was ever formed between the parties

Courts apply state law principles to determine whether a contract has been formed. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012).  Under Oklahoma law, a contract's proponent has the burden to establish its existence.  17B C.J.S. Contracts § 931 ("the burden of proof is on the party seeking to enforce an agreement or to claim rights under it."); *see also Dollar Rent A Car Sys., Inc. v. P.R.P. Enter's., Inc.*, No. 01 CV

698 JHP FHM, 2006 WL 1266515, at *22 (N.D. Okla. May 8, 2006), *aff'd*, 242 F. App'x
584 (10th Cir. 2007) (party asserting rights under contract has burden to establish existence
of the contract). "[A] district court considering the making of an agreement to arbitrate
should give to the party denying the agreement the benefit of all reasonable doubts and
inferences[.]" *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 Fed. Appx. 782,
786 (11th Cir. 2008).

"One of the essential elements of a contract is that there must
be mutuality of agreement; both of the contracting parties must assent to its terms. *Hart-
Parr Co. v. Brockreide*, 1920 OK 100, 77 Okla. 277, 188 P. 113, 114. Mutuality of assent
is judged by <u>an objective standard</u>, looking to the express words of the parties and their
visible acts, <u>not their subjective states of mind</u>." *Nat'l Env't Serv. Co. v. Ronan Eng'g Co*.,
256 F.3d 995, 1003 (10th Cir. 2001); Restatement (Second) of Contracts § 19(2) (1981)
(party's conduct not a manifestation of assent unless "he intends to engage in the conduct
and knows or has reason to know that the other party may infer from his conduct that he
assents").

Because a contract cannot be formed without the parties' mutual assent to the
essential terms of the agreement, *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d at 1255
(citing *Dunbar Eng'g Corp. v. Rhinosystems, Inc.,* 232 P.3d 931, 935 n. 8 (Okla. Civ. App.
Div. 2010)), "basic contract law principles in ... Oklahoma indicate that if an [electronic]
agreement gives a consumer <u>reasonable notice of its terms and the consumer affirmatively
manifests assent to the terms</u>, the consumer is bound by the terms. *Id.* (citing *First Nat'l
Bank & Trust Co. of El Reno v. Stinchcomb,* 734 P.2d 852, 854 (Okla.1987)) (emphasis

added).  Courts nationwide are in accord.  *See Meyer v. Uber Tech.'s, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (explaining that, in cases involving smartphone or online-based contracts, "[c]ourts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract…as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement").

However, "a person using the Internet may not realize that she is agreeing to a contract at all, whereas a reasonable person signing a physical contract will rarely be unaware of that fact." *Sgouros v. TransUnion Corp*, 817 F.3d 1029, 1034-35 (7th Cir. 2016).  In addressing whether a consumer has agreed to be bound by an online-based contract of adhesion, such as the one Defendant says Plaintiff agreed to in this case, courts typically classify consumer-facing websites that purport to bind consumers to certain terms of use as either a "clickwrap" or "browsewrap." A "clickwrap" is where a user clicks a button or checks a box that explicitly affirms acceptance of the terms after having the opportunity to view or scroll through the terms, and this type of agreement is generally enforced. *Sgouros,* 2015 WL 507584, at *4 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d 1029 (7th Cir. 2016); *Nguyen v. Barnes & Noble,*763 F.3d 1171, 1175-76 (9th Cir. 2014). A "browsewrap," on the other hand, is a page that purports to bind visitors to terms based merely on the visitors navigating or using the website, without requiring them to sign electronic documents or explicitly click an "accept" or "I agree" button. *Sgouros*, 2015 WL 507584, at *6. "Courts enforce browsewrap agreements only when there is actual or constructive knowledge of terms." *Id.*

"Of course, human ingenuity and the constant development of technology means that not all interfaces fit neatly into one of these two categories." *TopstepTrader, LLC v. OneUp Trader, LLC*, 2018 WL 1859040, at *3 (N.D. Ill. Apr. 18, 2018) (citing *Meyer*, 868 F.3d at 75-76). A page that falls in-between the "clickwrap" and the "browsewrap" has been termed a "hybrid" or "sign-in-wrap." *Id.* This type of "hybrid" page "never ha[s] the user take an affirmative action to explicitly agree to the terms of the site, but it does require some form of affirmative action by requiring the user to sign up for an account," or to take some other action such as placing an order for goods or services. *TopstepTrader*, 2018 WL 1859040, at *3. "Usually during [this] process, the webpage states something to the effect of: 'By signing up for an account [or placing an order] with [website provider], you are accepting the [website]'s terms of service.'" *Id.* "While a hyperlink to the Terms is provided, the user is not required to scroll through the terms, read the terms, or otherwise explicitly indicate that he agrees to those terms before pressing the 'Sign Up' [or 'Place Order'] button." *Id.* "In this scenario, the user 'agrees' to the terms by signing up or creating an account," or by placing an order. *Id.*

The Temu Flow is at best of the hybrid, "sign-in-wrap" variety. *See Selden v. Airbnb, Inc.,* 4 F.4th 148, 156 (D.C. Cir. 2021) ("a sign-in wrap bundles signing up for a service with agreement to the website's contractual terms."). "To determine whether sign-in-wrap and browsewrap agreements are enforceable, courts engage in fact-intensive inquiries of the layout and language of a website or application." *Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022).

9

Generally speaking, courts will only find a consumer to have assented to the terms of a "hybrid" web-based form where the website clearly and conspicuously notified the user, next to the operative button, that by clicking the operative button he or she is agreeing to the terms (which must be accessible via a hyperlink), and where the visitor thereafter clicked the operative button. The touchstone of "inquiry notice" is whether the consumer was clearly and conspicuously apprised that their click binds them to linked terms and conditions. *See Meyer*, 868 F.3d at 79 ("As long as the hyperlinked text was itself reasonably conspicuous…a reasonably prudent smartphone user would have constructive notice of the terms. While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice."); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 401 (E.D.N.Y. 2015) (noting that courts uphold hybrid agreements "where a hyperlink to the terms and conditions appears next to the only button that will allow the user to continue use of the website"); *e.g.*, *Forby v. One Techs., LP*, 2016 WL 1321194, at *1 (S.D. Ill. Apr. 5, 2016) (enforcing terms where the user clicked the "Continue" button and the following statement, with a hyperlink to the terms, appeared directly *above* the button: "By clicking on the 'Continue' button below, you agree to the Offer Details, to the Terms and Conditions"). Here, the Temu Flow does not amount to inquiry notice because of its design, which *inconspicuously* presented the Terms and Conditions which Defendant asserts control the parties' relationship.

In this case, Defendant contends that Plaintiff assented to the Terms of Service by clicking the buttons on the Temu Flow and in a subsequent login. However, the Temu Flow's layout and language– the first screen featuring a large bright orange Continue

button far above the "Terms of Use" hyperlink at the very bottom, submerged beneath four other buttons in another section of the registration screen and the second which did not advise a user they were agreeing to any of Temu's policies – failed to clearly and conspicuously notify Plaintiff (or any other consumer who clicked the Continue button) that the user was agreeing to be bound by the Terms of Service by clicking that button. Accordingly, Defendant cannot establish that Plaintiff mutually assented to Terms of Use or its incorporated arbitration provision.

Indeed, a federal court in Florida found just that holding that Defendant could not compel to arbitration a TCPA class action plaintiff based on purported assent to Defendant's Terms and Conditions by the exact registration screen at issue here.  The court in *Johnson v. Whaleco, Inc.*, Case No. 5:23-cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023) found that the initial registration screen was a browsewrap agreement because it permitted the plaintiff to register without visiting the terms and conditions.  As such, the agreement could only be deemed enforceable if the plaintiff had actual knowledge of the terms or if the hyperlink to the terms and conditions was sufficiently conspicuous.  *Id.* at *7.

*Johnson's* holding was based on a thorough examination of the same registration screen, which is reproduced here:



The *Johnson* court concluded the hyperlink was not sufficiently conspicuous to provide inquiry notice because the hyperlink was "not prominent or particularly remarkable at the bottom of the page where it is featured" *Id.* at *7, and that its "inconspicuous nature" was "further compounded by its poor placement on the website."  *Id.* at *8.  The court found it "not reasonable to expect a user to continue reading below the highly conspicuous purchase button" and explained that "the faint text linking to Defendant's browsewrap agreement is located at the bottom of the webpage beneath four other buttons and far below the bright-orange "Continue" button.  This placement does not put a reasonably prudent

user on inquiry notice." *Id.* at *8-9 (internal citations and quotations omitted). Moreover, the court was critical of the font size and color of the linked hyperlink (which it called "barely visible") stating: "Most damning to Defendant's attempt to enforce the Agreement is its use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues… This camouflaged font contradicts Defendant's assertion that its registration page displays a conspicuous hyperlink to [it]s Terms of Use. And crucially—it evinces an intent to *conceal* those hyperlinks from conspicuous view, which militates strongly against finding the existence of an agreement to arbitrate." *See Id.* (internal citations and quotations omitted) citing *Volt Info. Sciences, Inc. v. Board of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989) for proposition that "Arbitration under the [FAA] is a matter of consent, not coercion…").[1]

---

[1] Defendant's response to the directly on-point *Johnson* decision, which the Motion addresses in only part of a footnote, is puzzling to say the least. Defendant asserts *Johnson* was wrongly decided because *Johnson* labeled the registration flow a browsewrap and not a "hybrid-wrap" agreement. (Mot. at fn. 7). As explained in note 7, *infra*, Defendant has taken inconsistent positions on whether the flow is a browsewrap or hybrid-wrap. Whatever label *Johnson* ascribed, it is beyond dispute that the analysis undertaken was a "fact-intensive inquiries of the layout and language of a website or application." *See Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022) (explaining process courts use to evaluate enforceability of sign-in-wrap and browsewrap agreements).

Defendant also attempts to distance itself from *Johnson's* holding by characterizing the registration screen in *Johnson* as "a different Temu sign-up page" from that at issue here because in *Johnson* the "Terms of Use" were neither bolded nor underlined, and were thus not distinguishable as a hyperlink". (Mot. at fn. 7). The registration screen at issue in *Johnson* appears identical to the initial registration screen at issue here and is different only from the second registration screen because it lacks the sentence stating that an SMS would be sent to the user's phone. *See* Section II, *supra*. The registration screen in *Johnson* had a bolded hyperlink, just as the one here does. Defendant itself made that point directly to the *Johnson* Court in its Motion to Compel Arbitration stating: The words "**Terms of Use**" was in bold letters and there was a hyperlink to Whaleco's

As for the second screen, Defendant cannot claim that it effectively bound Plaintiff to Temu's Terms and Conditions when it contained no statement at all that by continuing the user was agreeing to be bound. The language Defendant opted to use merely states that a user can review Temu's Terms and Conditions, not that the consequence of advancing the flow by clicking the button was an assent to the Terms and Conditions. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29–30 (2d Cir. 2002) ("a consumer's clicking on a download button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the download button would signify assent to those terms"); *see also Soliman v. Subway Franchisee Advert. Fund Tr. Ltd.*, 442 F. Supp. 3d 519, 525 (D. Conn. 2020), *aff'd and remanded*, 999 F.3d 828 (2d Cir. 2021) ("Proximity without more, such as an express statement linking acceptance of the terms to the offer, is insufficient to presume awareness of the terms' applicability."); *Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1101 (S.D. Cal. 2018) ("[T]he proximity of the hyperlink in green typeface to the "place order" button, without affirmative acknowledgment of the agreement before proceeding with the purchase…is not enough to give rise to inquiry notice."). Simply stated, the second screen proposed nothing which would reasonably put Plaintiff or any other user on notice that clicking the Google account button amounted to assent to Temu's Terms and Conditions.

---

Terms of Use[.] (Defendant's Motion to Compel Arbitration, ECF No. 20 at 5-6), August 21, 2023, *Johnson v. Whaleco, Inc. d/b/a Temu*, 5:23-cv-00403-GPA-PRL). Moreover, the Court in *Johnson* specifically noted that the "Terms of Usse" hyperlink was in bold font. 2023 U.S. Dist. LEXIS 184104. at fn. 7. Thus, it is unclear what distinction Defendant is trying draw in its parenthetical citation of *Johnson* at footnote 7 between the *Johnson* registration screen and the one at issue here.

The problematic features of the Temu Flow which the *Johnson* decision evaluates are by no means an outlier.  Online marketers routinely use these tactics to keep customers from understanding the consequences of pressing buttons on a website and Courts frequently reject the notion that presentations like the one Defendant employed in the Temu Flow are capable of manifesting a reasonable consumer's assent to terms of use.  For example, in *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018), the First Circuit reversed the district court's granting of a motion to compel arbitration based on a careful analysis of the sign-in-wrap screens' presentation and layout.  Among the features the First Circuit noted that rendered the screens incapable of manifesting assent were the fact that "Uber's "Terms of Service & Privacy Policy" hyperlink did not have the common appearance of a hyperlink.  The Court stated:

> While not all hyperlinks need to have the same characteristics, they are "commonly blue and underlined*." CR Assocs. L.P. v. Sparefoot, Inc.*, No. 17-10551-LTS, 2018 WL 988056, at *4 n.4 (D. Mass. Feb. 20, 2018); see also e.g., *Meyer*, 868 F.3d at 78 ("[T]he hyperlinks are in blue and underlined."); *Adelson v. Harris*, 774 F.3d 803, 808 (2d Cir. 2014) ("[T]he hyperlinks were not hidden but visible in the customary manner, that is, by being embedded in blue, underlined text*."*) ...Here, the "Terms of Service & Privacy Policy" hyperlink was presented in a gray rectangular box in white bold text. Though not dispositive, the characteristics of the hyperlink raise concerns as to whether a reasonable user would have been aware that the gray rectangular box was actually a hyperlink.

*Cullinane*, 893 F.3d at 64

Here, as noted in *Johnson* the linked Terms and Conditions were presented in inconspicuous light grey text on a white background, and not in blue or some other more conspicuous color.  Other courts share the *Johnson* court's skepticism of the use of grey or light grey for notice purposes, what *Johnson* refers to as "an intent to conceal").   *See e.g.*

*Cullen v. Shutterfly Lifetouch, LLC*, No. 20-CV-06040-BLF, 2021 WL 2000247, at *8 (N.D. Cal. May 19, 2021) (finding defendant failed to carry its burden to prove assent to arbitration stating: "The subject language is in tiny print, that appears to be light gray in color, and there is no header or other indicator that would notify an individual of important contractual terms."); *Redbox Automated Retail, Inc.*, No. 19-cv-01993 at 15 (ECF No. 32) (N.D. Ill. Mar. 25, 2021) ("[T]he Court finds the gray disclosure text surrounding the hyperlinks not reasonably conspicuous because there is insufficient contrast between the gray text and the black background."); *see also Fisher v. Sutton Place/Pinnacle A.M.S.*, No. 1:07-CV-1537-DFH-WTL, 2008 WL 2095417, at *2 (S.D. Ind. May 16, 2008) ("The fact that the agreement imposes an obligation to arbitrate disputes is clear and prominent. This was not an arbitration agreement buried in small, light-gray type on the back of an invoice or purchase order. No literate person completing and signing the form could have missed the agreement to arbitrate, which is the subject of five of eight pages in the document."). For example, an identical contention by the defendant in *Sellers v. JustAnswer LLC,* 73 Cal. App. 5th 444, 479, 289 Cal. Rptr. 3d 1, 28 (2021), *reh'g denied* (Jan. 18, 2022), *review denied* (Apr. 13, 2022) was rejected by the court which found that the following sign-up-wrap presentation did not manifest the plaintiff's assent to be bound to the Terms of Service:



The *Sellers* court determined the linked text failed to provide adequate notice because of the presence of features <u>identical</u> to the Temu Flow, namely that "the textual notice on the mobile version is at the very bottom of the screen, in smaller text than anything else on the page, and in a grey hue that contrasts less with the dark background than any other text on the page." *Id.* at 479. The Temu Flow equally fails to manifest assent.

Further confirming that no reasonable consumer received clear or conspicuous notice of an agreement to hyperlinked Terms and Conditions on the Temu Flow is the presence of several other brightly colored buttons between the bright orange "Continue" button and the inconspicuous link residing at the bottom of the screens. The presence of these distracting buttons and fields, having nothing to do with Plaintiff's act of pressing the Continue button after inputting her email or phone number, between the Continue button and the Terms of Use sentence beneath those four buttons confirms no consumer

was on objectively reasonable notice that he or she would be assenting to be bound by the Terms of Use by clicking the orange Continue buttons.

In fact, given the distance between the bright orange Continue buttons and small grey sentence which states "By continuing you agree to our Terms of Use and Privacy and Cookie Policy" and the intervening presence of four buttons immediately above that sentence, it is reasonable that the *if* an ordinary consumer saw the sentence  at all – inconspicuous as it is – she or he would believe that the agreement to the "Terms of Service" only applied to registrations made by pressing one of the four immediately adjacent buttons, and not to the registrations via the orange "Continue" button, which appears in the upper third of the screen.

In *Cullinane*, the First Circuit noted that the presence of several buttons on the screen (as here) likely rendered a web-based form incapable of manifesting users' assent to the terms and conditions that were accessible via a hyperlink.  As the court put it: "the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention. If everything on the screen is written with conspicuous features, then nothing is conspicuous."

Likewise, in *Nicosia v. Amazon.com, Inc.*, where the defendant's order page - similar to the Temu Flow – stated that "by placing your order, you agree to Amazon.com's privacy notice and conditions of use," *Nicosia*, 834 F.3d 220, 237 (2d Cir. 2016) the Second Circuit found that, given the manner in which the statement appeared on the order page, the defendant had "failed to show that [the plaintiff] was on notice and agreed to mandatory

arbitration as a matter of law" when she clicked a "Place your order" button. The court explained its reasoning in pertinent part as follows:

> . . .
> The message itself—"By placing your order, you agree to Amazon.com's…conditions of use"—is not bold, capitalized, or conspicuous in light of the whole webpage.…There are numerous other links on the webpage, in several different colors, fonts, and locations, which generally obscure the message. …

*Nicosia*, 834 F.3d at 236-37 (citations omitted).

This was also the case in *Wilson v. Redbox Automated Retail, Inc.*, No. 19-cv-01993 at 11 (ECF No. 32) (N.D. Ill. Mar. 25, 2021) where the court found that linked Terms of Service were not effectively presented because "the button for the Terms of Use and accompanying disclosure [were] not adjacent to the "Pay Now" button. Rather, the "Pay Now" button appears in the middle of the right side of the screen while the Terms of Use and disclosure appear at the bottom.  The court found that the website's checkout page failed to manifest assent to the linked terms of service because of "general clutter" caused by intervening buttons between the "Pay Now" button and linked terms and conditions which stated "by pressing 'Pay Now' you agree to the Terms which "dilute[d]" the effectiveness of the notification."  *Id.* at 13.

This is more or less an apt description of the Temu Flow as *Johnson* highlighted: the Continue button is several rows above the linked Terms of Service, not immediately adjacent to it, and separated by a various options including a "Trouble signing in button" and four colorful buttons which provided alternative ways to sign up for a Temu.com account.

In *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015) the court found that even though the defendant put text *directly* above the sign in button, which stated that by signing in the user agreed to the terms of use, the disclosure was nonetheless "insufficient to give adequate notice." *Id.* at 404. The court explained that the "hyperlink to the 'terms of use' was not in large font, all caps, or in bold," especially in contrast to the "user-friendly and obvious" "'SIGN IN' button" that appeared "in all caps." *Id.* Accordingly, the court concluded that this "sign-in contract of adhesion" was "not binding on [plaintiff]." *Id.* Here, as in *Berkson*, pressing the Temu Flow's "Continue" buttons does not cause the "'terms of use' [to] appear in a new screen or in a [separate] pop-up window on the same screen," and "[t]he importance of the 'terms of use' [is] obscured by the physical manifestation of assent" to continue the registration flow either by pressing the Continue buttons or selecting one of four alternative ways to continue with the registration. *Id.* Accordingly, the only thing the Temu Flow is capable of manifesting is an intention to start a Temu account, and certainly not anyone's assent to the Terms of Use. *See also, Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (though defendant required plaintiff to click a "box" next to hyperlink with the defendant's terms of service, court concluded that plaintiff was not put "on inquiry notice of the terms of service," because the page featuring the clickable box featured a much larger "'Next' bar at the bottom of the screen," which "dwarfed" the "I agree to Lyft's Terms of Service" language that is featured in "smallest font on the screen," such that "[a] reasonable consumer would not have understood that the light blue 'Terms of Service' hyperlinked to a contract for review")

In this case, the Terms of Use link appeared in small grey font well below the giant, bright orange "Continue" button, with four other buttons (also brightly colored, featuring the logos of Google, Facebook, Twitter, and Apple) appearing in between the Continue button at the top and the Terms of Use link at the bottom. As in *Cullinane* the presence of these buttons diminishes the objective likelihood that a consumer would be apt to notice the linked Terms and Conditions. *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018).

In other words, "the layout and language" of the page fails to "give the user reasonable notice that a click [on the Continue button] will manifest assent to [the Terms of Use or its incorporated arbitration provision]." *Meyer*, 868 F.3d at 75. Simply put: the Temu Flow failed to adequately notify, in an objectively clear and conspicuous manner, Plaintiff or any other consumer that, by clicking the giant orange Continue buttons, they were agreeing to be bound by the Terms of Use mentioned at the bottom of the screen. Accordingly, Defendant has failed to satisfy its burden to show that Plaintiff or any other visitor of this page who pressed the Continue button manifested their assent to the Terms of Use (or its incorporated arbitration provision).

The authorities the Motion cites are all readily distinguishable. First, this case does not involve a "clickwrap" as Defendant suggests.[2] (Mot. at 14). At no point was a user

---

[2] Interestingly, in *Fontanez v. Whaleco, Inc.*, Case No. 53-2023CA-000374, slip op. Fla. Cir. Ct. Aug. 29, 2023) Defendant took the position that the Temu registration app agreement was a browsewrap. (ECF No. 33-3 at 5). But the label the ascribed to the Temu Flow does not change the essential fact that Defendant failed to present its Terms and Conditions in a clear and conspicuous manner capable of binding a reasonable consumer to those Terms and Conditions by virtue of a click of the "Continue" button.

required to acknowledge acceptance of the Defendant's Terms and Conditions in order to physically advance the flow.[3]

The myriad problems with Defendant's app's Terms and Conditions presentation are laid out above – a distracting interface with multiple colorful buttons with intentionally concealed, inconspicuous-by-design hyperlinks not in visual proximity to the "Continue" buttons which a user clicks to advance the registration flow.  Yet many of the authorities Defendant relies upon fail to address any of the website presentation issues at the heart of this dispute.  *See e.g., Beattie v. TTEC Healthcare Sols.,* 2019 WL 2189481 (D. Colo. May 21, 2019); *Graf v. Match.com, LLC*, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015); *Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (all cited by Mot. at 15-16).  These cases all stand for the basic but irrelevant proposition that a consumer's claimed ignorance of a website's Terms and Conditions will not in and of itself bar a finding of assent.  But the touchstone is whether a website's features, in totality, objectively amount to inquiry notice, which here, they plainly do not.

Other authorities which Defendant cites do feature *some* of the problematic elements of the Temu Flow such as the lack of proximity between the hyperlink and the continue button, or the presence of several distracting buttons, but in these cases, the courts found the websites sufficiently conveyed inquiry notice based on factors which are indisputably not present here.  *See e.g., Oberstein v. Live Nation Ent., Inc.*, 60 F. 4th 505, 515-516 ( 9th

---

[3] Defendant's citation to clickwrap cases such as *Davis v. USA Nutra Labs*, 303 F. Supp. 3d 1183 (D. N. M. Aug. 4, 2023) and *Clements v. Alto Tr. Co.*, 2023 WL 5002472, at *7 (D.N.M. Aug. 4, 2023) (both cited by Mot. at 15-16) are inapposite.

Cir. 2023) (cited in Mot. at 14) (browsewrap agreement manifested assent because the sign in button was directly above the terms of use hyperlink which "is written in bright blue font, distinguishing it from the surrounding text."); *Walker v. Neutron Holdings, Inc.*, No. 1:19-CV-574-RP, 2020 WL 703268, at *3 (W.D. Tex. Feb. 11, 2020), report and recommendation adopted, No. 1:19-CV-574-RP, 2020 WL 4196847 (W.D. Tex. Apr. 8, 2020) (sign in wrap agreement provided adequate notice where "the hyperlinked words **"User Agreement** & **Terms of Service**" in dark, bold font stood out from both the white screen and preceding gray text and the "Next" button (equivalent to the "Continue" button here) was separated from the linked terms and conditions by only one other button, not four, as here); *Babcock v. Nuertron Holdings Inc.*, 454 F. Supp. 3d 1222, 1230-34 (S.D. Fla. 2020) (same); *Meye*r *v. Uber Tech's, Inc.*, 868 F.3d 66, 78-79 (2d Cir. 2017) (despite the presence of multiple registration buttons, linked hyperlink adequately conveyed inquiry notice because "Although the sentence is in a small font, the dark print contrasts with the bright white background, and the hyperlinks are in blue and underlined.") (all cited by Mot. at 17).

The only case which Defendant identifies where an interface with multiple, distracting, colored buttons, with hyperlinked terms and conditions set forth in inconspicuous light grey font against a white background without an underline or other effective visual cue and not in visual proximity to the "continue" button was deemed to provide inquiry notice is *Fontanez v. Whaleco, Inc.*, Case No. 53-2023CA-000374, slip op.

Fla. Cir. Ct. Aug. 29, 2023), which involves the same registration screen as *Johnson* and here.[4]

*Fontanez* reached the opposite conclusion as *Johnson* finding that the linked "Terms of Use" was "in bold letters" sufficiently conveyed inquiry notice. *Johnson* examined and rejected this reasoning and *Fontanez's* conclusion. This Court should as well.

*Fontanez* failed to engage in any meaningful analysis of the features of Defendant's App-based registration. Whereas *Johnson* thoroughly parsed multiple features of Defendant's presentation concluding that they intentionally failed to provide inquiry notice, *Fontanez* noted only that the plaintiff did not need to scroll beyond the Apple subscription button which she clicked to see the hyperlink and the hyperlink was in bold. The *Johnson* court stated it disagreed with *Fontanez's* conclusions about the hyperlink's conspicuousness and specifically noted that: "the Court recognizes that the words "Terms of Use" and "Privacy & Cookie Policy" are in bold font. However, because the font color is itself such a light grey, even in bold font the words still appear significantly lighter than the conspicuous black and colorful text used elsewhere on the webpage and do not attract attention." *Johnson v. Whaleco, Inc.,* 2023 U.S. Dist. LEXIS 184104, *fn 7.[5] *Johnson* is obviously the better-reasoned decision and the one this Court should follow.

---

[4] Though the *Fontanez* decision does not include an image of the registration flow, Defendant asserts that the only material difference between Plaintiff's alleged registration and the plaintiff in *Fontanez* is that the *Fontanez* plaintiff registered using the Apple account registration button. (Mot. at fn. 7).

[5] *Johnson* further criticized the *Fontanez* court's s incorrect burden shifting regarding Plaintiff's actual knowledge. In *Fontanez* the court erroneously held that the arbitration agreement was

Defendant's bid to compel arbitration on these facts is offensive to any consumer's reasonable expectations of fair play, and this Court need not go along. Because Defendant has failed to satisfy its burden to show "an objective manifestation of assent", *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 981 (10th Cir. 2014), to the Terms of Use (and its incorporated arbitration agreement) by clicking the Continue button, the Court should find that this proceeding is not "referable to arbitration" and deny the Motion. *See* 9 U.S.C. § 3; *see also, e.g.*, *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304–05 (10th Cir. 2017) ("In present-day Oklahoma, a contract is defined by statute as "an agreement to do or not to do a certain thing.") (citing Okla. Stat. Ann. tit. 15, § 1); *see also Voss v. City of Okla. City*, 618 P.2d 925, 928 (Okla. 1980) ("An agreement for the submission of an issue to arbitrators is a prerequisite to the commencement of a valid arbitration agreement." ); *Boler v. Sec. Health Care, L.L.C.*, 336 P.3d 468, 477 (Okla. 2014) ("Consent to arbitrate is an essential component of an enforceable arbitration agreement.").

## IV.    CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated: January 19, 2024

---

separately enforceable because the plaintiff did not disavow actual knowledge of the Terms and Conditions.  *Johnson,* 2023 U.S. Dist. LEXIS 184104, fn. 8.

Respectfully submitted,

/s/  Kathy R. Neal
Mary Quinn-Cooper, OBA # 11966
Kathy R. Neal, OBA #674
McAFEE & TAFT, P.C.
Williams Center Tower II
Two W. Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone:  918-587-0000
Facsimile:  918-599-9317
Maryquinn.cooper@mcafeetaft.com
Kathy.neal@mcafeetaft.com

E. Powell Miller
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone:  248-841-2200
epm@millerlawpc.com

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF ELECTRONIC SERVICE AND FILING

I hereby certify that on this 19th day of January, 2024, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to those registered participants of the ECF System.

/s/ Kathy R. Neal