# Exhibit A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

VALERIE EAKINS, individually and on behalf )
of all others similarly situated, )
)
        Plaintiff, )
)
v. )   Case No. CIV-23-560-J
)
WHALECO INC. d/b/a TEMU, )
)
        Defendant. )

## ORDER

Before the Court is Defendant's Motion to Compel Arbitration [Doc. No. 33], wherein it moves to compel arbitration and dismiss or, alternatively, stay this action pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.* Defendant's brief in support was filed separately (Def.'s Br.) [Doc. No. 33-1]. Plaintiff responded (Pl.'s Resp.) [Doc. No. 39], and Defendant replied [Doc. No. 40].[1] Upon review of the parties' submissions, Defendant's motion to compel arbitration is denied.

### I.    Background

Plaintiff initiated this proposed class action under Oklahoma's recently enacted Telephone Solicitation Act (OTSA), Okla. Stat. tit. 15, § 775C.1 *et seq.*[2] She claims Defendant violated the OTSA by sending automated text messages to her cellular phone without prior express consent.

Defendant runs an online marketplace where consumers can purchase a variety of products. To participate in this marketplace, one must first create an account through Defendant's

---

[1] All page citations refer to the Court's CM/ECF pagination.

[2] The OTSA prohibits telephonic sales calls, including text messages, to wireless phones if such calls involve an automated system for the selection or dialing of telephone numbers without the prior express consent of the receiving party. *See* Okla. Stat. tit. 15, §§ 775C.2–775C.4.

smartphone application (App) or website. In doing so, a user is presented with the following screen[3]:



As shown, a user can create an account (1) by entering their email or phone number and pressing a bright orange "Continue" button, or (2) by pressing one of the other four white buttons. At the bottom of the screen, beneath the "Continue with Twitter" button, is a statement in light grey font that reads: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." The "**Terms of Use**" text is hyperlinked and, if pressed, leads to a separate document containing a mandatory arbitration provision.

On January 19, 2023, Plaintiff downloaded Defendant's App and created an account by entering her phone number. Pointing to Plaintiff's conduct and apparent agreement to

---

[3] The screenshot included herein was provided by both parties.

2

Defendant's terms, including arbitration, Defendant now moves to compel arbitration. Plaintiff, in response, argues that no arbitration agreement exists given the inconspicuous placement of the terms of use agreement.

## II.     FAA Framework

The FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "establishes a liberal federal policy favoring arbitration agreements," *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (internal quotation marks omitted), and "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

Yet, despite this liberal policy favoring arbitration, "the FAA was not enacted to force parties to arbitrate in the absence of an agreement." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1286 (10th Cir. 1997). "The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Id.* at 1287. This initial determination requires the application of "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). If a valid arbitration agreement exists, a court must then determine whether the dispute falls within the scope of that agreement. *Cavlovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018).

**III.    Analysis**

   **A.    Choice of Law**

At the outset, the parties disagree as to which state's law applies in determining whether an arbitration agreement exists. Defendant argues that New York law controls and points to a choice-of-law provision in its terms of use. Def.'s Br. at 16. Plaintiff counters that applying the choice-of-law provision to resolve the issue of contract formation would presume the applicability of a provision before its adoption by the parties has been established; she maintains that Oklahoma law controls. Pl.'s Resp. at 10.

But the parties' disagreement is largely irrelevant. In both states, parties must manifest their mutual assent to the essential terms of an agreement. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288–89 (2d Cir. 2019) (applying New York law); *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1256 (10th Cir. 2012) (applying Oklahoma law). "The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act," but "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." Restatement (Second) of Contracts § 19 (1981). "The making of contracts over the internet 'has not fundamentally changed the[se] principles of contract.'" *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)). Courts widely recognize that "[u]nless the website operator can show that a consumer has actual knowledge of the [online] agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her

4

assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (applying New York and California law); *see also Hancock*, 701 F.3d at 1256 (applying Oklahoma law); *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 882 (N.D. Ill. 2020) (applying Illinois law); *Gaudreau v. My Pillow, Inc.*, No. 6:21-cv-1899-CEM-DAB, 2022 WL 3098950, at *4 (M.D. Fla. July 1, 2022) (applying Florida law).

There is nothing to suggest that Plaintiff had actual notice of Defendant's terms of use. The Court must determine then whether Plaintiff received reasonably conspicuous notice that she was agreeing to Defendant's terms when creating her account.

### B. Online Agreements

Broadly speaking, there are two types of online agreements: "clickwraps" and "browsewraps." These agreements have been described as follows:

> [O]ne way in which we have previously distinguished web-based contracts is the manner in which the user manifests assent—namely, "clickwrap" (or "click-through") agreements, which require users to click an "I agree" box after being presented with a list of terms and conditions of use, or "browsewrap" agreements, which generally post terms and conditions on a website via a hyperlink at the bottom of the screen. Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking "I agree." Browsewrap agreements, on the other hand, do not require the user to expressly assent. Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions.

*Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (internal footnotes, citations, and quotation marks omitted); *see also Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) (describing clickwrap and browsewrap agreements similarly); *Hancock*, 701 F.3d at 1255 (describing clickwrap agreements similarly).

5

But there are countless ways to design a website or smartphone application, and "not all interfaces fit neatly into the clickwrap or browsewrap categories." *Meyer*, 868 F.3d at 75. Such is the case here, where Defendant's App notifies the user of its terms of use and, instead of providing an "I agree" box to check, advises the user that she is agreeing to the terms of use when creating an account. Similar agreements have been referred to as "sign-in-wraps,"[4] *see*, *e.g.*, *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015) ("A questionable form of internet contracting has been used in recent years—sign-in-wraps. These internet consumer contracts do not require the user to click on a box showing acceptance of the 'terms of use' in order to continue. Rather, the website is designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process."), though categorization is not dispositive, *see Meyer*, 868 F.3d at 76.

In the context of online agreements, courts engage in fact-intensive inquiries of "the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms." *Starke*, 913 F.3d at 289; *see also Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022) ("To determine whether sign-in-wrap and browsewrap agreements are enforceable, courts engage in fact-intensive inquiries of the layout and language of a website or application."). Such a focus is consistent with the parties' submissions—though they disagree on whether Defendant's App provided reasonably conspicuous notice.

---

[4] Defendant characterizes its online agreement as a clickwrap, likely because clickwrap agreements "are increasingly common and have routinely been upheld." *Hancock*, 701 F.3d at 1256 (internal quotation marks omitted). But Defendant's App did not require Plaintiff to check a separate box indicating her assent to Defendant's terms. Indeed, she could create an account without ever viewing Defendant's terms. The Court finds the agreement here is best characterized as a sign-in-wrap.

6

### C. Defendant's App

The Court turns its attention to Defendant's App. In doing so, it concludes that the App failed to provide reasonably conspicuous notice that Plaintiff was agreeing to Defendant's terms of use when creating her account.

For starters, the terms of use agreement appears in relatively small font at the bottom of the screen—spatially decoupled from the attention-grabbing orange "Continue" button that users click to create their account. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (recognizing courts' refusal to enforce online agreements "[w]here the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it"); *Starke*, 913 F.3d at 294 (rejecting enforcement of arbitration agreement where the "Terms & Conditions" hyperlink was "spatially decoupled" from the portion of the website "actually requiring [plaintiff's] attention"); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466–67 (S.D.N.Y. 2017) (rejecting enforcement of arbitration agreement where the "'I agree to Lyft's Terms of Service' [was] in the smallest font on the screen, dwarfed by the jumbo-sized pink 'Next' bar at the bottom of the screen and the bold header 'Add Phone Number' at the top"). While other, closer buttons are available, the orange button—in both placement and coloring—is set apart. One could argue it is initially unclear whether the terms of use agreement even pertains to the creation of an account using email or phone number.

Most glaring, however, is the App's failure to distinguish the "Terms of Use" hyperlink from its surrounding text. *See Berman*, 30 F.4th at 857 ("[W]hile it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent."). The notice here appears in grey font against a white backdrop, and while "Terms of Use" is a darker shade of grey, the contrast is neither remarkable nor presents with the traditional hallmarks

7

of hyperlinked text. *See id.* ("A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently set apart from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." (internal citation and quotation marks omitted)); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) ("While not all hyperlinks need to have the same characteristics, they are commonly blue and underlined." (internal quotation marks omitted)). Courts have generally "required more than mere coloring to indicate the existence of a hyperlink to a contract." *Applebaum*, 263 F. Supp. 3d at 467 (citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) ("Where the terms are not displayed but must be brought up by using a hyperlink, courts . . . have looked for a clear prompt directing the user to read them.")). The App's failure to adequately distinguish the hyperlinked text, coupled with its obscure placement of the terms of use agreement, fails the conspicuous test.

Defendant's reliance on *Fontanez v. Whaleco, Inc.*, No. 53-2023CA-000374 (Fla. Cir. Ct. Aug. 29, 2023), *see* (*Fontanez* Order) [Doc. No. 33-2],[5] does not alter the Court's conclusion. The *Fontanez* court examined the very online platform at issue here and concluded that its terms of use agreement was "conspicuous enough to put a reasonably prudent person on inquiry notice." *Id.* at 6. However, the plaintiff in *Fontanez* created her account with the "Continue with Apple" button "directly above" the terms of use agreement. *Id.* at 5. Moreover, and more importantly, she had already filed "eleven class action lawsuits," and the "reasonable inference [was] that . . . [she]

---

[5] It appears that this case is not available on Westlaw of LexisNexis.

8

should have been aware that online retailers have 'Terms of Use' or 'Terms and Conditions' agreements." *Id.* at 3.

*Fontanez*'s persuasive is further tempered by *Johnson v. Whaleco, Inc.*, No. 5:23-cv-403-GAP-PRL, U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023) (not available on Westlaw), which recently examined Defendant's online platform and concluded that its terms of use agreement was not conspicuously disclosed. The *Johnson* court reasoned, as this Court does here, that "the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the page where it is featured." *Id.* at *7 (brackets and internal quotation marks omitted). Even more "damning" was the platform's "use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues." *Id.* at *7–8.

Neither is the Court convinced that Plaintiff's subsequent use of the App—where she "was presented with a screen identical to the one she would have seen when she initially registered her account through the App back in January," Def.'s Br. at 13—weighs in favor of arbitration. If Defendant's notice was inconspicuous when Plaintiff created her account, the Court is unsure how such notice, if unaltered, became any clearer over time.

In sum, the Court concludes that the parties did not enter into a valid arbitration agreement. The Court need not address whether Plaintiff's claims fall within the scope of any arbitration agreement.

## IV. Conclusion

For the reasons set forth herein, Defendant's Motion to Compel Arbitration [Doc. No. 33] is DENIED.

IT IS SO ORDERED this 5th day of March, 2024.

9

_____
BERNARD M. JONES
UNITED STATES DISTRICT JUDGE